# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

JOHANNA HOLY ELK FACE, in her personal capacity and as Personal Representative of the ESTATE OF WAYLON JOHN

Plaintiff

v.

CITY AND COUNTY OF DENVER,

ANDREA WEBBER, Records Administrator for Denver Department of Public Safety,

DENVER POLICE DEPARTMENT,
Officer Zackary Kennedy Badge #20012
Officer John Schaal Badge #17063
Officer William Bartz Badge #17044
Officer Corey Hagan Badge #15023
Officer Eduardo Medero Badge #17023
Officer Vincent Kramer Badge #17075
Officer Monet Jackson Badge #19036
Officer Richard Eberharter Badge #18043
Officer Joshua Giannotti Badge #21013
Officer Christopher Vose Badge #18041
Sergeant Brian Husum Badge #07049
Corporal Brian Holm Badge #13020
Thomas Moen Badge #18014 (Retired)

DENVER HEALTH & HOSPITAL AUTHORITY,
Lauren Haley Leger, P.N.,
Denver Health Jail Healthcare John Does #1-15
Defendants Denver Health John Does #1-5

DENVER SHERIFF DEPARTMENT,
Francisco Gutierrez
Deputy Gabriel Andujar Badge #21041
Deputy Casey Meyer Badge #17041
Deputy Kelvin Ramirez Badge #08032
Deputy Devin Lucero Badge #12049
Deputy James Nystrom Badge #08041
Deputy Frank Mitchell Badge #17060
Denver Sheriff Department John Does #1-10
Denver Sheriff Department Command Staff John Does #11-15,
Denver Sheriff Department Medical Staff John Does #16-25

1

DEFENDANTS

---

CIVIL COMPLAINT AND DEMAND FOR DECLARATORY RELIEF AND JURY TRIAL

Plaintiff Estate of Waylon John, by and through Johanna Holy Elk Face, member of the Standing Rock Sioux Tribe and mother of Waylon John, respectfully brings this Complaint by and through undersigned counsel against Defendants for the brutal November 3, 2023 arrest and subsequent patient dumping, horrendous denial of medical treatment, and coverup of the prolonged suffering and November 7, 2023 death of Waylon John in the custody of Denver law enforcement, Denver Health Hospital, & Denver Health's Jail Healthcare partners. The Estate of Waylon John and Ms. Holy Elk Face submits this Complaint and hereby seek damages, declaratory relief, and a trial by jury to determine Defendants' liability for the November 2023 arrest and in-custody death of Waylon John.

In support of this complaint and request, the Estate of Waylon John, by and through his mother Ms. Holy Elk Face, now alleges as follows:

## I.    INTRODUCTION

1.    On November 3, 2023, Ms. Holy Elk Face's son Waylon John was targeted, assaulted and battered, arrested and imprisoned, and denied access to necessary medical care on the streets of Lakewood, Colorado by Denver law enforcement officials. He was unlawfully "dumped" by Defendant Denver Health on November 3, 2023, transferred to the neglectful custody of the Denver Sheriff's Department and their Denver Health Jail Healthcare Partners November 3-7, 2023 with no ability to communicate with his family and friends. On the morning of November 7, 2023, Mr. John collapsed in his cell from cardiac arrest. Ms. Holy Elk Face learned that her

son was in the ICU at Defendant Denver Health on the afternoon on November 7, 2023. By the time she arrived at Denver Health Mr. John was dead.

2.      Plaintiff Johanna Holy Elk Face, Personal Representative of the Estate of Waylon John, seeks damages for the baseless and excessively violent arrest causing injury of her son Waylon John on November 3, 2023 by Denver Police Department ("DPD") and Denver Sheriff Department ("DSD") Defendants on the streets of Lakewood, Colorado pursuant to Denver law enforcement's own unconstitutional policies, practices, and failure to train Denver officers. Plaintiff asserts claims concerning the November 3 arrest pursuant to 42 U.S.C. § 1983, the United States Constitution, and the Colorado Constitution.

3.      Plaintiff also seeks damages for the November 3-7, 2023 misconduct of Denver Health and Hospital Authority ("Denver Health") Jail Healthcare provider Defendants, who, in violation of federal law and pursuant to unconstitutional policy and practice, denied Mr. John appropriate and necessary medical screening or stabilizing care, choosing instead to summarily dump Mr. John on November 3, 2023 into the custody of the Denver Sheriff's Department and healthcare partner Defendants, who from November 3-7, 2023, deprived Mr. John of objectively necessary medical care despite knowledge of Mr. John's serious medical conditions. This denial of care, pursuant to the unconstitutional policies, practices, and failure to train Denver Sheriff Department and Denver Health Jail Healthcare partners, bore horrible fruit when DSD officials and Denver Health Jail Healthcare partners discovered Mr. John having a seizure in cardiac arrest on the morning of November 7, 2023, alone in his cell covered in blood and vomit. DSD officials and Denver Health Jail Healthcare partners medicated the Decedent and transported him to Denver Health Hospital, where medical staff removed him from life support without free, prior and informed consent of him or his family, and outside of the presence of his family. The

claims concerning the denial of medical care by DSD officials and Denver Health Jail Healthcare partners are asserted pursuant to 42 U.S.C. § 1983, the United States Constitution, 42 U.S.C. § 1395dd, and the Colorado Constitution.

4.  Plaintiff Johanna Holy Elk Face has for many months in good faith attempted to resolve questions about her son's arrest, detention, and death through record requests to Defendant Andrea Webber, informal meetings with Denver's Citizen Oversight Board ("COB"), and complaint to Denver's Office of Independent Monitor ("OIM"). Defendants have responded to Plaintiff's search for answers with excuses, obfuscation of responsibility, and refusal to provide basic transparency as required by law.

5.  Therefore, Plaintiff Holy Elk Face also hereby seeks the disclosure of records relating to the November 3 arrest, November 3-7 detention, and November 7, 2023 death of her son Waylon John in the custody of DPD and DSD. Plaintiff brings these claims pursuant to the Colorado Criminal Justice Records Act ("CCJRA"), C.R.S. § 24-72-301, *et seq.* and Colorado's Enhance Law Enforcement Integrity Act ("ELEIA" or "Integrity Act"), C.R.S. §24-31-902. The Court's intervention is now necessary to declare that the Defendants are accountable under the Integrity Act and CCJRA, and which Defendants must provide Plaintiff with the records containing the answers she seeks that are necessary to the litigation and determination of the claims set forth herein by the Estate of Waylon John.

## II.  JURISDICTION AND VENUE

6.  The federal claims for monetary damages are brought before this Court pursuant to 42 U.S.C. §1983 to address the deprivations of the rights, privileges, and immunities secured to Waylon John by the United States Constitution while Defendants were acting under color of state authority.

7.      Because this action involves an actual controversy, this court also has jurisdiction under the provisions of 28 U.S.C. §§ 2201–2202 to grant Plaintiff declaratory relief regarding the constitutionality of the actions and policies of local government.

8.      This Court has jurisdiction over the Constitutional claims asserted herein pursuant to 28 U.S.C. §1331, which gives district courts original jurisdiction over civil actions arising under the Constitution, laws, or treaties of the United States, and 28 U.S.C. § 1343(a)(3), which give federal district courts jurisdiction over actions to secure civil rights extended by the United States government.

9.      Pursuant to 28 U.S.C. §1367, this Court has supplemental jurisdiction over the claims alleging violations of Waylon John's rights pursuant to the Colorado Constitution because the state claims and the federal claims form part of the same case or controversy.

10.      Pursuant to 28 U.S.C. §1367, this Court also has supplemental jurisdiction over the claims concerning violations of Colorado state law mandating disclosure of records, because the state claims and the federal claims form part of the same case or controversy, and the determination and disclosure of records is necessary to litigation of this matter.

11.      Venue is proper in the District of Colorado pursuant to 28 U.S.C. §1391(b) because all the acts and events giving rise to this complaint occurred in the District of Colorado.

### III. PARTIES

12.      The decedent Waylon John was a citizen of the Standing Rock Sioux Tribe, a descendant of the Navajo Nation, brother and nephew to many, and father to one child born in 2021. Born on May 19th, 1990, Mr. John was a beacon of love, creativity, intelligence, and humor who brightened the lives of everyone who knew him. A gifted culinary and mural artist, Mr. John was known for his exceptional talents in the kitchen and was much beloved for his unquenchable

spirit and creativity, which he brought through art to the community through murals that decorate the walls of the Denver area.

13.    Plaintiff Johanna Holy Elk Face (a/k/a Johanna John) brings this action in her personal capacity and as Personal Representative of the Estate of Waylon John, a Dakota ("Sioux") mother and grandmother, an enrolled citizen of the federally-recognized Standing Rock Sioux Tribal Nation, citizen of the United States, and resident of Colorado. She is the mother of four, including Waylon John.

14.    Plaintiff, her son, and their family, are among the many Original Nations and Peoples who since time immemorial have stewarded and lived in deep relationship to the lands now known as Denver, Colorado.

15.    As the mother of Waylon John and representative of his Estate, Plaintiff Holy Elk Face is "person in interest" as defined by the Colorado Criminal Justice Records Act. C.R.S. 24-2-302(10) (2025).

16.    As the mother of man who died in custody and a civilian who submitted complaint concerning law enforcement misconduct, Plaintiff Holy Elk Face is entitled to records pursuant to the Integrity Act. C.R.S. 24-31-902(2)(a), (b)(1) (2025).

17.    Defendant City and County of Denver is a municipality incorporated according to the laws of the State of Colorado.

18.    Defendant Andrea Webber is sued in her official capacity as the Records Administrator for Denver Department of Public Safety (hereinafter "DPS"). Defendant Webber is the statutory "official custodian" of records because she is the employee of the Denver DPS who is responsible for the maintenance, care, and keeping of criminal justice records and the authorized person having personal custody and control of the records sought from the local law enforcement

agencies in this case. C.R.S. 24-72-302(5), (8). Denver's Department of Public Safety is a political subdivision of the State of Colorado.

19.     Defendant Denver Police Department (hereinafter "DPD") is an agency of the City and County of Denver, which is a consolidated home rule city and county and a political subdivision of Colorado. At all times relevant, DPD, its agents, and its employees were acting under color of state law.

20.     Defendant Denver Police Officer Zackary Kennedy is an employee of DPD. He is sued in his individual capacity.

21.     Defendant Denver Police Officer John Schaal is an employee of DPD. He is sued in his individual capacity.

22.     Defendant Denver Police Officer Vincent Kramer Badge is an employee of DPD. He is sued in his individual capacity.

23.     Defendant Denver Police Officer Eduardo Medero is an employee of DPD. He is sued in his individual capacity.

24.     Defendant Denver Police Corporal Brian Holm is an employee of DPD. He is sued in his individual capacity.

25.     Defendant Denver Police Officer Monet Jackson is an employee of DPD. She is sued in her individual capacity.

26.     Defendant Denver Police Sergeant Brian Husum is an employee of DPD. He is sued in his individual capacity.

27.     Defendant Thomas Moen is a former employee of DPD who retired in 2025. He is sued in his individual capacity.

28.     Defendant Denver Police Officer John Eberharter is an employee of DPD. He is sued in his individual capacity.

29.     Defendant Denver Police Officer Joshua Giannotti is an employee of DPD. He is sued in his individual capacity.

30.     Defendant Denver Police Officer William Bartz is an employee of DPD. He is sued in his individual capacity.

31.     Defendant Denver Police Officer Christopher Vose Badge is an employee of DPD. He is sued in his individual capacity.

32.     Defendant Denver Police Officer Corey Hagan is an employee of DPD. He is sued in his individual capacity

33.     Defendant Denver Health & Hospital Authority, D/B/A "Denver Health Medical Center" and "Denver Health" (hereinafter "Denver Health"), is a political subdivision of Colorado with its principal office address at 777 Bannock Street, Denver, Colorado 80204. At all relevant times, Denver Health, its agents, and its employees were acting under color of state law.

34.     Defendant Nurse Lauren Haley Leger P.N. was an employee of Denver Health who worked in the Denver Health jail unit at all times relevant to this Complaint. She is sued in her individual capacity.

35.     Defendants Denver Health John Does #1-5, at all relevant times, were employees of Defendant Denver Health with a principal place of business at Defendant Denver Health, serving as medical personnel involved in the treatment of Mr. John and alerting his family on the morning of November 7, 2023.

36.     Defendants Denver Health Jail Healthcare Partner John Does #1-15, at all relevant times, were employees of Defendant Denver Health with a principal place of business at Defendant

Denver Health, serving as medical personnel involved in the treatment or lack thereof of Mr. John at the Denver Downtown Detention Center, and were acting under color of state law.

37.    Denver Health Jail Healthcare Partners John Does #1-15 are unknown at this time because Defendant Denver Health and Defendant Denver Department of Public Safety refuse to disclose relevant records concerning Mr. John. Denver Health Jail Healthcare Partners John Does #1-15 were at all times relevant to this complaint employees of Denver Health working in the Denver Downtown Detention Center. They are sued in their individual capacities.

38.    Denver Sheriff's Department (hereinafter "DSD") is an agency of the City and County of Denver, which is a consolidated home rule city and county and a political subdivision of Colorado. At all times relevant, DSD, its agents, and its employees were acting under color of state law.

39.    Defendant Denver Sheriff Deputy Gabriel Andujar is an employee of DSD. He is sued in his individual capacity.

40.    Defendant Francisco Gutierrez is a former employee of DSD, and was so employed at all times relevant to this complaint. He is sued in his individual capacity.

41.    Defendant Kelvin Ramirez is an employee of DSD. He is sued in his individual capacity.

42.    Defendant Devin Lucero is an employee of DSD. He is sued in his individual capacity.

43.    Defendant John Nystrom is an employee of DSD. He is sued in his individual capacity.

44.    Defendant Frank Mitchell is an employee of DSD. He is sued in his individual capacity.

45.    Defendant Casey Meyer is an employee of DSD. He is sued in his individual capacity.

46.    Defendant Denver Sheriff Department Denver Sheriff Department John Does #1-10, Denver Sheriff Department Command Staff John Does #11-15, and Denver Sheriff Department Medical Staff John Does #16-25 are unknown at this time because Defendant Denver Health and

Defendant Denver Department of Public Safety refuse to disclose relevant records concerning Mr. John. At all relevant times Denver Sheriff Department John Doe Defendants were employees of Defendant DSD, responsible for monitoring and ensuring medical treatment or lack thereof of Mr. John at the Denver Downtown Detention Center. They are sued in their individual capacities.

## IV. FACTUAL ALLEGATIONS

*The November 3, 2023 Stop and Arrest of Waylon John*

47.     On November 3, 2023, Denver law enforcement officers, including Defendant Police Officer Zackary Kennedy, Defendant Police Officer Corey Hagan, Defendant Police Officer John Schaal, and Defendant Police Officer William Bartz received a bulletin of a known suspect in a narcotics case. The suspect was not Decedent Waylon John.

48.     At some point after the bulletin was issued, at approximately 1:44PM on the afternoon of November 3, 2023, Defendants Kennedy, Schaal, and Bartz approached a dumpster behind the Wendy's fast food restaurant located at 550 Sheridan Boulevard, Denver, Colorado 80226. Multiple people were behind the dumpster.

49.     Defendant DPD Officers Zackary Kennedy, William Bartz, and John Schaal approached the dumpster behind the Wendy's. One person ran from behind the dumpster eastbound on Sixth Avenue toward Denver while Defendants Kennedy, Bartz, and Schaal detained and handcuffed two individuals on site: M.S. and R. Doe.

50.     Defendant DPD Officer Corey Hagan arrived at the Wendy's in an unmarked Kia shortly after Defendants Kennedy, Bartz, and Schaal put M.S. and R. Doe into handcuffs. Shortly after

he arrived on scene Defendant Hagan gestured toward M.S. and R. Doe, telling Defendants Kennedy, Bartz, and Schaal "that's the guy in the bulletin. He's the one in the bulletin."

51.     Even though the Officer Defendants had restrained the person from the bulletin in custody, Defendants Hagan, Kennedy, Bartz, and Schaal did not alert other officers to this fact, instead radioing other officers to be on the lookout for a Hispanic male in all black clothing.

52.     Even though the Officer Defendants knew that the person who ran was **not** the person listed in the bulletin, Defendant Officers Hagan, Kennedy, Bartz, and Schaal did not alert other dispatch or other officers that the subject who ran was not listed in the bulletin.

53.     Instead of calling off the chase, Defendant Officers Hagan, Kennedy, and Bartz, along with Defendant Denver Police Officers Eduardo Medero, Monet Jackson, Vincent Kramer, Brian Holm, Brian Husum, Richard Eberharter, Thomas Moen, Joshua Giannotti, and Christopher Vose chased a man wearing all black through the streets of Lakewood, Colorado. The Defendants alerted Lakewood police to their activities, but could not tell Lakewood dispatch what specific crime they suspected the person who ran committed.

54.     Defendant Officers Hagan and Medero saw Decedent Waylon John walking in front of the rooms facing the parking lot of the Panorama Motel on North Sheridan Boulevard. Mr. John was wearing a black jacket, black sweat pants, and a pale shirt.

55.     At approximately 1:50PM, Mr. John sat on the curb in front of the Panorama Motel as Defendants Medero and Hagan ran toward him.

56.     Defendant Medero kicked Mr. John to the ground on his back even though Mr. John was compliant, sitting down with his hands raised, not making any hostile motions or gestures.



57.      After Defendant Medero kicked Mr. John, Defendants Medero and Hagan used a physical "take-down" maneuver to throw Mr. John down onto his chest and face onto the concrete. Both officers then physically knelt and pushed onto Mr. John's legs and back, further compressing his chest and face into the pavement while using pain compliance techniques and force to wrench Mr. John's arms behind his back and into handcuffs.

58.      Defendants Medero and Hagan's use of physical force caused injuries to Mr. John's head, face, and body, including his chest.

59.      At the time they retrained him, Defendant Officers Hagan and Medero did not have reasonable, articulable suspicion to believe that Mr. John committed a crime or to physically seize him by kicking him, slamming his face and chest into the ground, kneeling on him and using pain compliance techniques to handcuff him.

60.      When they kicked Mr. John onto his back on the pavement, slammed his face and chest into the concrete, kneeled on him, and used pain compliance techniques to apply handcuffs, Defendant Officers Hagan and Medero used greater force than would have been reasonably necessary to restrain Mr. John's freedom of movement and arrest Mr. John. This force was applied without probable cause to believe that Mr. John was committing or wanted for a crime.

61.     Mr. John was sitting on the ground with his hands up and obeying commands when Defendants Hagan and Medero ran toward him and used physical force against him to restrain his freedom of movement. Defendants Hagan and Medero used greater physical force that would have been reasonably necessary to arrest Mr. John, who posed no immediate threat of serious bodily injury or death to anyone.

62.     Defendants Hagan and Medero were not in any danger when they decided to use physical force on Mr. John, who was not suspected of any specific crime, did not pose an immediate threat to the safety of officers, was not believed or found to be in possession of any weapons, and was not actively resisting arrest or trying to flee when he was kicked and then slammed on the ground.

63.     Defendant Hagan did not intervene in Defendant Medero's unlawful and excessive use of force, but instead participated by jumping on to Mr. John, slamming his face and chest into the ground, and using force to restrain Mr. John and apply plain compliance techniques even though Defendant Hagan knew that Mr. John was not the person who was identified in the bulletin.

64.     Defendants Kennedy, Jackson, Kramer, Holm, Husum, Eberharter, Moen, Giannotti, and Vose converged on the scene as Defendants Medero and Hagan were holding Mr. John face and chest down on concrete, kneeling on him, and using pain compliance to handcuff him.

65.     By statute, officers are required to activate their body-worn cameras when responding to a call for service. C.R.S. 24-31-902(1)(a)(II)(A). At all times relevant to this complaint, the Denver Police Department maintained a policy concerning body-worn cameras.

66.     Defendants Medero, Husum, Holm, Kramer, Eberharter, and Giannotti did not activate their body-worn cameras until after the use of physical force upon and arrest of Mr. John.

13

67.    Defendant Kennedy did not intervene in the use of force even though he knew and had been advised by Defendant Hagan that Mr. John was not the person who was identified in the bulletin.

68.    At no point did Defendants Jackson, Kramer, Holm, Husum, Eberharter, Moen, Giannotti, or Vose intervene in the unlawful and excessive use of force by Defendants Medero and Hagan.

69.    While Defendants Medero and Hagan were on top of his back and legs applying handcuffs, Mr. John told them he was overdosing on four fentanyl pills that he had accidentally ingested.

70.    Even though Mr. John was overdosing and had just been kicked, tackled, knelt on, and subjected to pain compliance, Defendant Officers advised Lakewood police to "slow down" their response.

71.    Defendants Kennedy and Schaal later issued a criminal complaint against Mr. John, alleging two misdemeanors: Obstructing a Peace Officer in violation of C.R.S. 18-8-104(a)(1) and Tampering with Physical Evidence of a Misdemeanor in violation of C.R.S. 18-8-610(1)(a), (3)(b).

72.    Paramedics employed by Defendant Denver Health arrived at the scene of the arrest. They noticed that Mr. John had falling oxygen levels and placed him on supplemental oxygen, then transported Mr. John to Defendant Denver Health Emergency Department.

*November 3, 2023 Patient Dumping*

73.    Upon arrival at Defendant Denver Health, Mr. John was admitted to the Emergency Department where he remained in handcuffs and under the watch of law enforcement.

74.    Mr. John indicated to Denver Health medical providers that he accidentally ingested four fentanyl pills, that he had pain in his chest and difficulty breathing.  Denver Health providers observed him to be having an "accidental overdose," as well as suffering from chest pain and difficulty breathing, including wheezing and coughing.

75.    At all times relevant to this complaint, Defendant Denver Health & Hospital Authority had policies and procedures in effect for the screening of patients in the emergency department to determine whether or not an emergency medical condition existed, and for stabilizing such any such conditions.

76.    At all times relevant to this complaint, Defendant Denver Health had policies and standing orders concerning assessment and stabilizing treatment of patients with difficulty breathing, including shortness of breath with wheezing and coughing.

77.    At all times relevant hereto, Defendant Denver Health had policies and standing orders concerning assessment and stabilizing treatment of patients with cardiovascular conditions, including abnormal ECG/EKG exams and chest pain

78.    Mr. John told Denver Health providers that he had accidentally ingested four fentanyl pills, and that he did not regularly take that many fentanyl.

79.    Even though  Denver Health providers knew from their training and experience that Mr. John may be suffering from a drug overdose and indicated that Mr. John was "Positive SBIRT" (Screening Brief Intervention Referral Treatment), they did not do an appropriate medical screening examination within the capability of Defendant Denver Health's Emergency Department (or ancillary services routinely available to the Emergency Department) by testing Mr. John's blood or urine to determine the levels of any drugs in his system, which was reasonably necessary to determine whether an emergency medical condition existed.

80.     Defendant Denver Health providers did not order Mr. John admitted for stabilizing treatment or monitoring for a suspected drug overdose.

81.     Mr. John arrived at the Defendant Denver Health Emergency Department complaining of pain in his chest. In response to Mr. John's complaints of chest pain Denver Health providers administered an electrocardiogram (ECG) and chest x-ray on Mr. John. The results of Mr. John's ECG were "abnormal."

82.     After learning that Mr. John's ECG results were abnormal, Defendant Denver Health providers did not order any additional medical examination of Mr. John's cardiac condition, nor did they admit him for treatment required to stabilize his medical condition prior to transferring him to the Denver Downtown Detention Center.

83.     Mr. John arrived at the Defendant Denver Health Emergency Department complaining of difficulty breathing. He was wheezing, coughing, and displayed falling blood oxygen levels. In response to Mr. John's complaints of difficulty breathing, Denver Health providers placed him on supplemental oxygen but did not order any additional medical examination of Mr. John's respiratory condition, nor did they admit him for treatment required to stabilize his medical condition prior to transfer.

84.     Even though Mr. John was suffering in an unstable medical condition including overdose, chest pain and difficulty breathing, Denver Health providers transferred Mr. John to Defendant Denver Health Jail Healthcare Partner Nurse Lauren Haley-Legel and John Doe  Denver Health Jail Healthcare Defendants #1-15 without any stabilization, prescriptions, or instructions for follow up care other than one discharge note: "please don't (sic) use drugs."

85.     Defendant Denver Health providers did not perform an examination or render any treatment for the head, face, and neck injuries Mr. John sustained from DPD Defendants use of force.

86.     In spite of the known and obvious risk that a combination of untreated overdose, heart condition, and difficulty breathing might become life-threatening, Denver Health providers did not order necessary medical examinations of Mr. John's conditions or admit him for treatment required to stabilize his emergency medical conditions prior to transfer to DSD custody and Denver Jail Healthcare Defendants.

87.     The Denver Downtown Detention Center is not a medical facility.

88.     Even if the Denver Downtown Detention Center is considered a "medical facility," transferring Mr. John to the Denver Health Jail Healthcare Partner Nurse Lauren Haley-Legel and John Doe Denver Health Jail Healthcare Defendants #1-15 was not an appropriate transfer.

89.     The transfer to the Denver Downtown Detention Center was not requested in writing by Mr. John or certified in writing by a physician that the medical benefits reasonably expected from the transfer outweighed the increased risks to Mr. John.

90.     Instead of ensuring that Mr. John received responsive assessment and care at the hospital for further medical evaluation and treatment for a head injury, breathing difficulty, substance interactions/overdose, and possible injuries to his head, face, and neck, Denver Health providers discharged Mr. John in the custody of DPD and DSD officials and the Denver Downtown Detention Center following a summary examination and clearance at Denver Health.

91.     A Denver Health nurse called Defendant Jail Healthcare Partner Nurse Lauren Haley-Legel to report the transfer of Mr. John to the Denver Downtown Detention Center at approximately 7:20PM on November 3, 2023.

*November 3-7, 2023 Detention at Denver Downtown Detention Center*

92.    Mr. John's booking photo from November 3 shows injuries to his face and head.



93.    Mr. John was held in custody of DSD at the Denver Downtown Detention Center November 3-7, 2023. Despite his obvious injuries and documented serious medical needs, Denver Sheriff Department Defendants Gutierrez, Andujar, Meyer, Ramirez, Lucero, Nystrom, and Mitchell, DSD John Does #1-10, DSD Command Staff John Does #11-15, and DSD Medical Staff John Does #16-25, Defendant Jail Healthcare Partner Nurse Lauren Haley-Legel Denver Health Jail Healthcare Partner John Doe Defendants #1-15 denied Mr. John medically necessary treatment.

94.    In the Spring of 2025, Mr. John participated in the Medically Assisted Therapy ("MAT") program in the Denver Downtown Detention Center because he required medically assisted therapy for his substance abuse condition.

95.    At all times relevant to this Complaint, Defendant Denver Sheriff Department maintained a policy regarding cell checks.

96.     At all times relevant to this Complaint, Defendant Denver Sheriff Department maintained a policy regarding operation of Body Worn Cameras.

97.     At all times relevant to this Complaint, Defendant Denver Sheriff Department maintained a policy regarding the provision of healthcare for pretrial detainees like Mr. John.

98.     Denver Sheriff Department Defendants Gutierrez, Andujar, Meyer, Ramirez, Lucero, Nystrom, and Mitchell, DSD John Does #1-10, DSD Command Staff John Does #11-15, and DSD Medical Staff John Does #16-25, Defendant Jail Healthcare Partner Nurse Lauren Haley-Legel, and Denver Health Jail Healthcare Partner John Doe Defendants #1-15 were on notice of Mr. John's history of substance abuse issues because of Mr. John's prior participation in the MAT program and his medical diagnosis of "accidental overdose" with chest pain, cardiac and respiratory issues in the Denver Health Emergency Department on November 3, 2023.

99.     Mr. John was housed in the medical unit on the second floor of the Denver Downtown Detention Center.

100.    Even though DSD Defendants and Denver Health Jail Healthcare Partner Defendants #1-15 were on notice of Mr. John's conditions and knew of his housing placement in the second floor medical unit, Denver Sheriff Department Defendants Gutierrez, Andujar, Meyer, Ramirez, Lucero, Nystrom, and Mitchell, DSD John Does #1-10, DSD Command Staff John Does #11-15, and DSD Medical Staff John Does #16-25, Defendant Jail Healthcare Partner Nurse Lauren Haley-Legel, and Denver Health Jail Healthcare Partner John Doe Defendants #1-15 failed to provide Mr. John with the proper medications and monitoring for a person with cardiac and respiratory conditions who is overdosing.

101.    Instead, Mr. John was allowed to vomit and bleed in his cell for four days without treatment. Denver Sheriff Department Defendants Gutierrez, Andujar, Meyer, Ramirez, Lucero,

Nystrom, and Mitchell, DSD John Does #1-10, DSD Command Staff John Does #11-15, and DSD Medical Staff John Does #16-25, Defendant Jail Healthcare Partner Nurse Lauren Haley-Legel, and Denver Health Jail Healthcare Partner John Doe Defendants #1-15 did not monitor Mr. John sufficiently on November 3, 4, 5, 6, or 7 to take note of the increasing pile of vomit and food trays next to his door, the vomit on the floor of his cell, or the blood collecting under his head in his cell, or to treat the conditions causing Mr. John to continuously vomit and bleed.

102.    During the four days in custody of the Denver Downtown Detention Center, Mr. John did not have access to the phone, family visits, or counsel DSD John Does #1-10, DSD Command Staff John Does #11-15, and DSD Medical Staff John Does #16-25 and Denver Health Jail Healthcare Partner John Doe Defendants #1-15 did not allow Mr. John to contact his mother, Plaintiff Johanna Holy Elk Face, or other family members.

103.    Denver Sheriff Department Defendants Gutierrez, Andujar, Meyer, Ramirez, Lucero, Nystrom, and Mitchell, DSD John Does #1-10, DSD Command Staff John Does #11-15, and DSD Medical Staff John Does #16-25, Defendant Jail Healthcare Partner Nurse Lauren Haley-Legel, and Denver Health Jail Healthcare Partner John Doe Defendants #1-15 knowingly ignored the substantial risk of serious harm to Mr. John by failing to monitor or treat Mr. John's overdose, cardiac, or respiratory conditions, including by failing engage in cell checks or activate body worn cameras.

104.    Denver Sheriff Department Defendants Gutierrez, Andujar, Meyer, Ramirez, Lucero, Nystrom, and Mitchell, DSD John Does #1-10, DSD Command Staff John Does #11-15, and DSD Medical Staff John Does #16-25, Defendant Jail Healthcare Partner Nurse Lauren Haley-Legel, and Denver Health Jail Healthcare Partner John Doe Defendants failed to take reasonable measures to abate the substantial risk of serious harm to Mr. John by leaving Mr. John in a cell

filled with vomit and blood, suffering from an untreated head wound, and refusing to appropriately escalate his level of care as his condition deteriorated.

105.     Waylon John suffered a sufficiently serious harm in that he was in severe pain and fear of death for four days before he died of cardiac arrest, during which time he was not provided with either the medical treatment that could have reduced his pain nor the medical diagnosis that could have removed his fear of death.

106.     On the morning of November 7, 2023, former Denver Sheriff Department Deputy Defendant Francisco Gutierrez failed to make required rounds and did not conduct a cell check of Mr. John, who had been vomiting and bleeding in his cell unattended for an unknown period of time.

107.     On the morning of November 7, 2023, Denver Sheriff Department Defendant Gabriel Andujar failed to activate his body-worn camera when interacting with Mr. John.

108.     When Defendant Gutierrez approached Mr. John's cell at approximately 8:35AM on November 7, 2023, Mr. John was gripping his head crying "seizure" before he lost consciousness. There was vomit surrounding his bunk and piling up beside the door of his cell, and there was blood on his bunk and the floor of the cell.

109.     DSD John Does #1-10, DSD Medical Staff John Does #16-25 and Denver Health Jail Healthcare John Doe Defendants #1-15 injected Mr. John with Narcan shortly after finding him collapsed on the floor of his cell.

110.     DSD John Does #1-10, DSD Medical Staff John Does #16-25 and Denver Health Jail Healthcare John Doe Defendants could not recall Mr. John's name when they began emergency medical measures and attempts to revive Mr. John before Emergency Medical Technician personnel arrived.

111.    After Mr. John collapsed DSD John Does #1-10, DSD Medical Staff John Does #16-25 and Denver Health Jail Healthcare John Doe Defendants observed Mr. John to have no blood pressure reading at all, and his pulse to be "really low" with no registration of heartbeat, requiring Denver Sheriff Department John Doe Defendants and Denver Health Jail Healthcare John Doe Defendants to begin CPR shortly after injecting Mr. John with Epinephrine.

112.    DSD John Does #1-10, DSD Medical Staff John Does #16-25 and Denver Health Jail Healthcare John Doe Defendants could not tell Emergency Medical Technician personnel how long Mr. John had been in medical distress.

113.    DSD John Does #1-10, DSD Medical Staff John Does #16-25 and Denver Health Jail Healthcare John Doe Defendants were unable to provide Emergency Medical Technician personnel with any information regarding Mr. John's medical history even though Mr. John had been transferred to the jail from the hospital only four days prior with known and serious medical conditions, was housed on the medical unit within the jail, and previously participated in the MAT program within the jail.

114.    Paramedics transported Mr. John back to Denver Health on the morning of November 7, 2023.

115.    Following his arrival at Denver Health on the morning of November 7, 2023 Denver Health providers ordered a chest x-ray which indicated that Mr. John was suffering from a costophrenic angle pneumothorax, a lung condition that commonly occurs following injury to the chest.

116.    On the morning of November 7, 2023 Denver Health providers ordered a drug panel screen of Mr. John's urine. This test was also available to Denver Health Defendant providers on November 3, 2023 but was not performed.

117.     Even though Mr. John was born at Denver Health hospital and received care there throughout his life, hospital staff intentionally did not contact his family until after noon on November 7, 2023.

118.     Plaintiff Johanna Holy Elk Face's contact information was in Mr. John's medical file and available to DSD John Does #1-10, DSD Command Staff John Does #11-15, and DSD Medical Staff John Does #16-25 and Denver Jail Healthcare Partner Joe Doe Defendants

119.      A John Doe Jail Healthcare Partner removed Plaintiff Johanna Holy Elk Face's contact information from Decedent's emergency contact and medical file

120.     Due to the decision DSD John Does #1-10, DSD Command Staff John Does #11-15, and DSD Medical Staff John Does #16-25 and/or Denver Health Jail Healthcare John Doe Defendants and/or Denver Health Defendants #1-5 not to contact Ms. Holy Elk Face or other family members, Plaintiff was unable to speak with or see Mr. John in his final days and hours

121.     By the time Plaintiff arrived at Defendant Denver Health on the afternoon of November 7, 2023, Mr. John's body was cold.

122.     At the time of Mr. John's death, he had a grapefruit-sized injury to his skull that was observed by witnesses.

123.     An autopsy performed on Mr. John concluded that Mr. John died of a self-administered overdose, a condition which all Denver Health Defendants and Denver Sheriff Department Defendants reasonably knew or should have known, and which put Mr. John's life and health at serious risk when he was transferred to their care from the Denver Health Emergency Department on November 3, 2023.

## V.    DISCLOSURE OF RECORDS

124.    Plaintiff seeks records from Defendant Webber, Defendant DPD, and Defendant DSD pursuant to the Colorado Criminal Justice Records Act ("CCJRA") C.R.S. 24-72-301 et seq, and pursuant to the Colorado Enhance Law Enforcement Integrity Act ("ELEIA" or "Integrity Act") C.R.S. 24-31-902

125.    A record of an "official action" is any record pertaining to "an arrest; indictment; charging by information; disposition; pretrial or posttrial release from custody; judicial determination of mental or physical condition; decision to grant, order, or terminate probation, parole, or participation in correctional or rehabilitative programs; and any decision to formally discipline, reclassify, or relocate any person under criminal sentence." C.R.S. § 24-72-302(7). Records of official action are subject to mandatory disclosure. C.R.S. § 24-72-303(1); *Harris v. Denver Post Corp.*, 123 P.3d 1166, 1174 (Colo. 2005).

126.    All other records made, maintained, or kept by DPS in the exercise of its official functions are "criminal justice records." C.R.S. § 24-72-302(4). Unless specifically exempt, all criminal justice records may be made available for public inspection. C.R.S. § 24-72-304(1).

127.    The Integrity Act also provides an avenue of request records from law enforcement agencies such as Defendants DPS, DPD, and DSD. C.R.S. 24-31-902.

128.    The Colorado legislature passed The Integrity Act in June 2020 following the police murders of George Floyd and Elijah McClain. The purpose of the statute was to provide public transparency regarding official use of force and deaths in custody. It is important for courts to consider this context and the "widespread bipartisan support for enhanced transparency in law enforcement," which prompted the enactment of this legislation. *SMB Advertising v. City of Boulder,* No. 2024CV30320, at 10 (Colo. Dist. Ct. Aug. 12, 2024)

*<u>Plaintiff's Efforts to Obtain Records Regarding November 3-7, 2023</u>*

129.    On December 6, 2023, undersigned counsel sent an evidence preservation request letter to DSD and other agencies involved in Decedent's arrest and death.

130.    On January 16, 2024, Plaintiff, through counsel, submitted a CORA/CCJRA record request to Defendants.

131.    The records Plaintiff seeks are records of "official actions" and "criminal justice records" under the CCJRA. A records custodian must disclose records of official actions. C.R.S. 24-72-302(4), (7).  The same applies to criminal justice records unless disclosure would harm the public interest. *Id.* A records custodian must make records of both types available within a reasonable time and, upon request, must provide a written statement of the grounds for any denial. C.R.S. 24-72-303(1), (2), (3).

132.    As detailed below, Defendants Webber, DPD, and DSD have not provided any of the records requested respecting Mr. John's time in custody November 3, 4, 5, or 6, and have only partially provided records concerning the November 3 arrest of Mr. John and his collapse on the morning of November 7 pursuant to CORA/CCJRA.

133.    On October 3, 2024, Plaintiff, through counsel, submitted a complaint to the Denver Office of Independent Monitor ("OIM") concerning the arrest, detention, and in-custody death of Waylon John.

134.    Following Plaintiff's October 3, 2024 complaint, on October 25, 2024 undersigned counsel again requested Defendant Webber produce the records.

135.    On March 4, 2025, Plaintiff, through counsel, reiterated the January 2024 CORA/CCJRA request and October 2024 records request specifying that the requests were pursuant to ELEIA as well as pursuant to CORA/CCJRA.

136.    The Integrity Act requires disclosure of all audio and video of Waylon John's in-custody

treatment following Plaintiff's October 2024 complaint and the multiple investigations into

Waylon's arrest, in-custody treatment, and death:

> For all incidents in which there is a complaint of peace officer misconduct by another peace officer, a civilian, or nonprofit organization, through notice to the law enforcement agency involved in the alleged misconduct, the local law enforcement agency or the Colorado state patrol shall release, upon request, all unedited video and audio recordings of the incident, including those from body-worn cameras, dash cameras, or otherwise collected through investigation.

C.R.S. 24-31-902(a)(2).

*Denver Oversight Agencies Inconsistent, Incomplete and Usurious Responses*

137.    Defendants did not respond to the January 2024 CORA/CCJRA request until April 2024,

at which time records were denied by Defendant Webber. The denial was purportedly due to an

open Administrative Investigations Unit ("AIU") investigation S2023-0727.

138.    On May 17, 2024 Plaintiff testified to the Denver Citizen Oversight Board ("COB") to

explain her family's story and request access to the records concerning Waylon John's arrest,

detention, and death. The COB expressed sympathy and encouraged Plaintiff to complain to the

Office of Independent Monitor, but did not take any action regarding Plaintiff's request for

records.

139.    On October 14, 2024, OIM confirmed receipt of the October Complaint and an OIM

investigation under "OIM2024-0236."

140.    On October 30, 2024, the OIM confirmed closure of OIM Case number OIM2024-0236.

141.    On November 1, 2024, Defendant Webber sent an email confirming that DSD AIU

investigation S2023-0727 was closed. As this investigation was the purported basis for denial of

access to records in March 2024, Defendant Webber stated that she could now provide an

estimate for costs for the records requested in January 2024.

142.    On November 6, 2024, the OIM also confirmed the October 9, 2024 closure of

Investigation S2023-0727 via email with a letter attached. Even though the letter from OIM indicated a second letter from the Department of Safety Public Integrity Division ("PID") would be forthcoming with a record of the decision in the matter, no such letter ever arrived.

143.    On December 10, 2024, Defendant Webber partially produced records concerning Waylon John's interactions with Denver law enforcement agencies on the afternoon of November 3 and the morning of November 7, 2023.

144.    The incomplete response from Defendant Webber did not include any records or recordings from DSD on November 3, 4, 5, 6, or until emergency measures began on the morning of November 7, 2023 after Mr. John had already collapsed in his cell.

145.    The December 10, 2024 DPS incomplete response and release of records did reveal that the S2023-0727 investigation into the death of Waylon John resulted in at least two DSD officials – Defendants Andujar and Gutierrez – being found in violation various agency rules and regulations concerning Body-Worn Camera ("BWC") and cell checks surrounding Mr. John's death.

146.    Even though the letters to the Defendant agent-subjects of these actions cited investigation S2023-0727, the findings and disciplinary actions were not indicated in the closure letter sent to counsel on November 6, 2024.

147.    The incomplete record release on December 10, 2024 did not indicate BWC or other records related to Defendant Andujar.

148.    Defendant Webber's incomplete December 10, 2024 release  included several arrest reports from Mr. John's prior criminal matters, and a November 3, 2023 summons and complaint as well as booking slip related to the arrest of Waylon John on November 3, 2023. The Denver Summons and Complaint for two misdemeanor offenses alleged on November 3, 2023 appears to

have been assigned case number "23CR2050."

149.    On December 10, 2024, Defendant Webber requested that Plaintiff pay $2,751 for the incomplete and only partially-responsive records.

150.    Plaintiff requested a waiver of these costs waiver pursuant to C.R.S. § 24-72-305(1), taking into consideration the personal involvement of Waylon John and his family in his arrest, detention, and death, Waylon John's indigency, and Ms. Holy Elk Face's indigency.

151.    On December 11, 2024, Defendant Webber denied Plaintiff's request for a fee waiver and based the denial on the need " to be fair and equitable to all members of the public requesting records."

152.    On January 10, 2025, Counsel received via email a second investigation closure letter regarding a third investigation numbered S2024-0647. The letter attached to the January 2025 email was dated January 10, 2024 but indicated that the S2024-0647 investigation was initiated in response to Counsel's October 2024 complaint. The January 2025 email letter indicated that the S2024-0647 AIU investigation was closed on January 8, 2024.

153.    By letter postmarked January 15, 2025, the Independent Monitor sent Counsel another letter indicating that Administrative Investigation Unit ("AIU") investigation S2024-0647 was closed "on January 8, 2024." Even though the letter was postmarked January 15, 2025, the letter was dated December 18, 2024.

154.    On March 26, 2025, Defendant Webber responded to Counsel's October 25, 2024 and March 4, 2025 ELEIA and CORA/CCJRA requests simply stating "no public criminal record exists with respect to such person."

155.    On March 27, 2025, counsel responded to Defendant Webber citing the text of the Integrity Act and requesting an immediate response in light of the Complaint submitted six

months prior and repeated requests for records under CCJRA and the Integrity Act.

156.    On April 2, 2025, Defendant Webber again responded to counsel's inquiry stating "at this time, no public criminal record exists with respect to such a person."

157.    On July 22, 2025, a City of Denver employee working for the COB called undersigned counsel to explain that Mr. John's records had not been produced per the Integrity Act because the criminal case leading to Mr. John's arrest had been sealed. The employee confirmed this information had been passed to the COB through informal conversations and there was no record of these conversations; nor could the employee provide the case number for the criminal case allegedly preventing disclosure of the requested records.

158.    Colorado Court systems reflect that Mr. John's only open criminal case is Adams County 2023CR002281, where he was charged with one count of Motor Vehicle Theft as a Class 6 felony.  Based on his failure to appear on October 10, 2023, the court issued a warrant for Mr. John.  The last entry in the register of actions notes Mr. John was detained on November 3, 2023. No motions to seal have been filed, nor has the Adams County District Attorney or Mr. John's counsel moved to close the case because of Mr. John's death.

159.    The Denver criminal matter referenced in Defendant's incomplete December 2024 disclosure is 23CR2050. A review of Colorado Courts filings does not indicate any such matter in the Denver courts. This lack of record of any such case for Mr. John leads undersigned counsel to believe that this is the sealed criminal matter to which COB staff alluded in July 2025 as the basis for refusal to disclose records concerning Mr. John.

160.    There is no provision in the Integrity Act that allows a law enforcement agency to refuse to disclose responsive records following either a complaint of misconduct or family member request for records concerning mistreatment and death in custody based on sealing of a

Decedent's criminal record without the request or consent of a Decedent-Defendant or Decedent's Estate.

161.    Plaintiff now seeks redress from this Court in the form of damages for the injuries, medical neglect, and death of her son compounded by the bureaucratic nightmare a declaration regarding the rights and responsibilities of the parties, and an order to show cause

162.    Here, the tragic circumstances of Mr. John's death and Defendant Webber's refusal to disclose records to his family are aggravated by the City of Denver's history of wrongful death and medical neglect of people in custody, which led to establishment of "Emily's Protocols" in 2008 following the ghastly jail death of Emily Rice in 2006.[1]

163.    Emily's Protocols purported to change Denver's policies and actions toward vulnerable persons with medical needs in custody, and are directly applicable to the facts and circumstances surrounding Mr. John's death.[2] Moreover, on November 23, 2023, just two weeks following Mr. John's wrongful death, the troubling lack of transparency concerning deaths in custody leading to outrageous litigation costs was highlighted in a letter to the Denver Mayor and City Attorney from the Citizen Oversight Board.[3]

164.    When there has been a complaint of law enforcement misconduct the Integrity Act requires the release of records to the complainant within twenty-one days of a request for records. It provides in relevant part:

---

[1] *See* "Settlement with Denver Health Reached in Emily Rice Case" https://www.westword.com/news/settlement-with-denver-health-reached-in-emily-rae-rice-case-5859354.

[2] *See* Citizen Oversight Board "Emily Protocols" 2008, available at https://www.denvergov.org/files/assets/public/v/1/citizen-oversight-board/documents/resources/emilys-protocols-2008.pdf

[3] *See* November 24, 2023 Letter from Denver Citizen Oversight Board, available at https://www.denvergov.org/files/assets/public/v/2/citizen-oversight-board/documents/misc/settlement-oversight-letter.pdf.

> For all incidents in which there is a complaint of peace officer misconduct … the local law enforcement agency … shall release, upon request, all unedited video and audio recordings of the incident, including those from body-worn cameras, dash cameras, or otherwise collected through investigation, to the public within twenty-one days after the local law enforcement agency … received the request for release of the video or audio recordings.

C.R.S. § 24-31-902(2)(a).

165.    The Integrity Act separately mandates release of records to a requesting family member or legal representative. C.R.S. § 24-31-902(2)(b)

166.    Unlike CCJRA, there is no provision in the Integrity Act allowing for a law enforcement agency to condition release of records on payment.

167.    The text of the Integrity Act does not allow a law enforcement agency to deny release of records for being related to a closed criminal proceeding alleged against the decedent whose family is making the request.

## VI. MUNICIPAL & INSTITUTIONAL LIABILITY

*Denver Police Unconstitutional Policies and Practices Regarding Use of Force*

168.    The City and County of Denver maintains official policies, widespread customs, and persistent practices that encourage and tolerate the use of excessive force during arrests, including:

    a.   Inadequate training on de-escalation techniques;

    b.   Failure to require intervention when officers witness excessive force;

    c.   Insufficient supervision during arrests and detentions;

    d.   Systematic failure to activate body-worn cameras during use of force incidents.

169.    Denver's pattern of excessive force is demonstrated by numerous prior incidents resulting in serious injuries and deaths, settlements, and Department of Justice investigations.

170.    The City and County of Denver have persistently failed to discipline police and sheriff department officers for excessive force and constitutional violations, including, for example the failure to take disciplinary action against Officer Faun Gomez, despite averaging a "use of force" incident once a week, and despite her roles in the deaths of both Emily Rice and Marvin Booker.

171.    By failing to adequately discipline officers who use excessive force, Denver has created a culture of impunity that emboldens officers to violate constitutional rights without fear of consequences.

*Denver Health's Unconstitutional Training, Policies, Practices, and Customs in violation of EMTALA*

172.    At all times relevant to this Complaint, the City of Denver contracted with Denver Health to provide medical care and services to people jailed at the Denver Downtown Jail.

173.    Denver Health maintained constitutionally deficient training, policies, practices, and customs in the Emergency Department by failing to adequately train and supervise its employees with respect to proper procedures for the evaluation and treatment of the serious medical needs of patients who arrive in the custody of law enforcement

174.    Denver Health also maintained constitutionally deficient policies in the Downtown Detention Center and failed to adequately train and supervise employees with respect to proper procedures for the evaluation and treatment of the serious medical needs of prisoners and pretrial detainees.

175.    Defendant Denver Health is required by law to provide assessment and stabilization for emergency medical conditions to all patients arriving in the Emergency Department, including patients who are in the custody of law enforcement

176.    It is a common and recurring need in all jails that pretrial detainees and prisoners have medical conditions that require timely transport to hospitals for higher level assessment and higher acuity care. This is especially common when detainees and prisoners were previously screened by the Emergency Department and have a record of cardiac issues, substance abuse, and active overdose.

177.    Evaluating and addressing the needs of prisoners with symptoms of chest pain, shortness of breath, seizures, vomiting, diarrhea, as well as associated medical conditions, is a usual and recurring task for Denver Health medical personnel in the Denver Downtown Detention Center.

178.    Individual Denver Health Emergency Department providers deliberately and unlawfully transferred Mr. John from the Denver Health Emergency Department while he was suffering from an obvious medical crisis, after they recklessly determined that he should be housed in the jail without recommendations for follow-up care or prescriptions

179.    Denver Sheriff Department Defendants Gutierrez, Andujar, Meyer, Ramirez, Lucero, Nystrom, and Mitchell, DSD John Doe Defendants, Defendant Jail Healthcare Partner Nurse Lauren Haley-Legel, and Denver Health Jail Healthcare Partner John Doe Defendants deliberately and recklessly failed to monitor Mr. John's symptoms November 3-7, 2023, and recklessly failed to send him back to the hospital no matter how sick he became, causing him to die alone in his cell covered in vomit and blood.

180.    Denver Sheriff Department Defendants Gutierrez, Andujar, Meyer, Ramirez, Lucero, Nystrom, and Mitchell, DSD John Doe Defendants, Defendant Jail Healthcare Partner Nurse Lauren Haley-Legel, and Denver Health Jail Healthcare Partner John Doe Defendants deliberately refused to obtain higher level evaluation and made reckless medical decisions concerning Mr. John, including ignoring his escalating and serious health needs.

181.    Even after Mr. John's cell was piled with vomit and covered with blood, Denver Sheriff Department Defendants Gutierrez, Andujar, Meyer, Ramirez, Lucero, Nystrom, and Mitchell, and DSD John Doe Defendants failed to conduct cell checks while Defendant Jail Healthcare Partner Nurse Lauren Haley-Legel, and Denver Health Jail Healthcare Partner John Doe Defendants continued to follow their deliberately indifferent plan of refusing to provide emergency treatment or transfer back to the hospital even though they knew that Mr. John had been assessed as having an overdose, chest pain, and respiratory and cardiac conditions on November 3, 2023. All of this occurred pursuant to Denver Health's custom of completely disregarding subjective complaints of pretrial detainees and prisoners and objectively serious medical needs.

182.    Each of the Individual Defendants violated Mr. John's constitutional right to be free from deliberate indifference to his medical needs in essentially the same unconstitutional manner—failing to treat his significant medical problems, ignoring life-threatening symptoms, dismissing symptoms, and failing to refer him for higher level evaluation and stabilizing treatment despite knowing that failing to do so put Mr. John at significant risk of serious illness or death.

183.    Denver Health did not take any immediate corrective action against any Individual Defendant in response to Mr. John's death. Instead, Denver Health has followed suit with Denver DPS, refusing to disclose records concerning Mr. John's healthcare and contacts with Denver Health Jail Healthcare Partner John Doe Defendant employees from November 3-7, 2023.

184.    Defendant Denver Health's pitifully inadequate treatment of Mr. John was pursuant to Denver and Denver Health's customs, policies and/or practices of unlawful conduct, including

a.  Deliberately refusing to provide patients who arrive at the ED with adequate evaluation, screening or stabilizing care for obvious and emergent medical conditions before transfer to jail

b.  Failing to screen for drug overdose conditions or to provide stabilizing care for persons who may be overdosing on drugs – whether such overdoses are accidental or purposeful

c.  Deliberately refusing to provide patients in the custody of law enforcement (especially pretrial detainees or prisoners) who exhibit signs of addiction or substance abuse with necessary medication or referrals for follow up care

d.  Taking a "wait and see" approach to providing medical care to people who arrive in the ED in the custody of law enforcement who are suffering from obvious, serious medical needs that require immediate attention

e.  Failing to provide care based on harmful racist assumptions that patients with histories of substance abuse (particularly Black, Indigenous, and other racialized patients) are lying about, faking, or exaggerating their symptoms for the purpose of seeking drugs;

f.  Deliberately clearing patients who arrive in the custody of law enforcement to the Emergency Department for transfer to the jail instead of providing reasonable screening, evaluation and necessary stabilizing treatment for emergent and serious medical conditions, a pattern and practice that violates the EMTALA;

g.  Failing to provide care to patients in custody due to prioritizing convenience over necessary medical treatment;

h.  Delegating medical decision-making to unqualified jail correctional staff, and requiring jail medical personnel to participate in correctional staff job activities that are contrary to a medical provider's duty of care

i.  Refusal to discipline jail medical personnel, and covering up for the wrongdoing of jail medical staff even when confronted by obvious constitutional violations in the form of patterns of deliberate indifference to serious medical needs

j.  Failing to adequately train jail medical providers regarding escalation of care for emergency medical conditions; and

k.  Failing to adequately staff jail healthcare detention facilities

185.  Pursuant to these customs, policies and/or practices, Denver Health medical personnel delay necessary medical care for the people housed in the jail, causing them suffering, harm, and irreparable damage. Denver Health medical personnel customarily ignore prisoners' requests for medical care until it is too late.

186.  The customs, policies, practices, and failures to train are self-perpetuating in that untrained, understaffed, undisciplined medical personnel acting as correctional officers without regard to their duty of care to incarcerated patients deliberately, repeatedly, and customarily, violate the constitutional rights of imprisoned patients with objectively serious medical needs.

187.  These failures to train, customs, policies, and/or practices have been the moving force behind multiple Denver Health medical prisoner deaths, serious injuries, and unnecessary pain, suffering, humiliation, and emotional trauma of Denver prisoners and their loved ones.

188.  The following examples are representative of Denver Health's customs, policies, and practices of: (1) taking a "wait and see" approach to providing medical care to prisoners who are suffering from obvious, serious medical needs that require immediate attention; (2) failing to

provide care based on assumptions that prisoners are lying about, faking, or exaggerating, their symptoms; (3) failing to provide care due to prioritizing convenience over necessary medical treatment. These customs, policies, and practices are caused, in whole or at the very least in part, by Denver and Denver Health's failure adequately train or to discipline officers and nurses or find them to have engaged in wrongdoing in the face of obvious constitutional violations.

189.    In 2006, Emily Rice died in Denver jail custody after being denied adequate medical care for her seizure disorder and other medical conditions, leading to a $7 million dollar wrongful death settlement and the establishment of "Emily's Protocols" in 2008. *See Estate of Emily Rice v. City and County of Denver,* 1:07-cv-01571 (Dist. Colo.).

190.    The 2008 case of Timothy Thomason, who was denied his terminal cancer medications while in pre-arraignment detention despite informing officers of his Stage IV non-Hodgkin lymphoma diagnosis, resulting in his death, for which Denver paid $150,000. *See Thomason v. City and County of Denver,* 1:07-cv-01715 (Dist. Colo.).

191.    The 2010 death of Marvin Booker in Denver jail custody, resulting in a $6 million settlement in 2014, after deputies used excessive force including tasers and restraints that lead to his death. *See Estate of Marvin Booker v. City and County of Denver,* 1:11-cv-00645 (Dist. Colo.).

192.    The 2011 case of Jamal Hunter, tortured by fellow inmates while the on-deputy ignored his screams and allegedly turned off lights to obstruct video surveillance, resulting in a $3.25 million settlement. *See Estate of Jamal Hunter v. City and County of Denver,* 1:12-cv-02682 (Dist. Colo.)

193.    The 2014 case of Rebecca Trujillo, whose spinal injuries resulting from a severe accident in the Denver jail were ignored and untreated from 2012-2013 until her release, resulting in a settlement. *See Rebecca Trujillo v. City and County of Denver*, 1:14-cv-02798 (Dist. Colo.)

194.    The 2015 death of Michael Marshall in Denver jail custody after being forcibly restrained and denied proper medical care, resulting in a $4.6 million settlement.

195.    The 2022 death of 79-year-old Leroy "Nicky" Taylor in Denver jail custody, where staff were deliberately indifferent to his medical needs despite his insistence that he was dying. *See Estate of Leroy Taylor v. City and County of Denver*, 1:23-cv-02355 (Dist. Colo.)

196.    These cases provide only a few representative examples of the rampant pattern and practice of deliberate indifference to serious medical needs by Denver Health medical personnel inside and outside of the Denver jail, and the lack of adequate training or supervision on the part of the Denver law enforcement and Denver Health to prevent these dangerous and unlawful patterns of conduct.

197.    These lawsuits and other documented incidents involving Denver Health employees' deliberate indifference to serious medical needs and cover ups thereof demonstrate of the culture and accepted customs, policies, practices and lack of training that existed amongst Denver Health employees during the incident outlined in this Complaint. The untimely deaths and serious medical disabilities of Ms. Rice, Mr. Booker, Ms. Trujillo, Mr. Marshall, Mr. Taylor were the result of Denver Health's conscious and deliberate policy choices which were the moving force behind the injuries and death inflicted on these individuals who had no choice but to rely on Denver Health staff for medical care and attention

198.    The cases set forth above are by no means the only examples of Denver Health's culture of unconstitutional disregard for the health, wellbeing, and lives of people housed in the downtown jail.

*Pattern and Practice of Coordinated Misconduct Between Denver Sheriff Department and Denver Health*

199.    The City and County of Denver and Denver Health and Hospital Authority maintain an unconstitutional policy and practice of coordination between law enforcement and medical personnel that systematically violates the rights of detainees.

200.    This coordination includes:

     a.    Perfunctory medical clearances at Denver Health that deliberately understate or conceal injuries to facilitate continued detention;

     b.    Prioritizing security concerns and jail capacity over medical necessity;

     c.    Mutual concealment of force-related injuries and serious medical conditions;

     d.    Systematic violations of EMTALA requirements for proper medical screening.

171    Despite knowledge that this coordination frequently results in constitutional violations, Denver Sheriff and Denver Health Defendants have maintained these practices, demonstrating deliberate indifference to detainee rights.

*Pattern and Practice of Deliberate Indifference to Medical Needs of Prisoners and Pretrial Detainees*

201.    The City and County of Denver has a long-standing pattern and practice of deliberate indifference to the serious medical needs of pretrial detainees in its custody, dating back over two decades.

202.    In 2006, Emily Rice died in Denver jail custody after being denied adequate medical care for her seizure disorder and other medical conditions, leading to a $7 million dollar wrongful

death settlement and the establishment of "Emily's Protocols" in 2008. *See Estate of Emily Rice v. City and County of Denver,* 1:07-cv-01571 (Dist. Colo.).

203.     Emily's Protocols were specifically designed to ensure proper medical screening, monitoring, and treatment of vulnerable persons in Denver custody, including requirements for

    a. Comprehensive medical screenings for "any person coming to the jail from the hospital;

    b. Immediate presentation of inmates with serious medical needs to medical staff on-site or at the infirmary (Protocol #7)

    c. Medical "kite" system requiring inmates who submit written requests be seen by next nursing line (Protocol #10);

    d. Automatic alerts to supervisors and medical staff when inmates arrive from hospitals (Protocol #6a);

    e. Monitoring protocols, requiring deputies to conduct 2 rounds per hour for normal cells, and 4 rounds per hour for medical observation cells in Pre-Arraignment Detention Facilities ("PADF") (Protocol #17);

    f. Continuous video monitoring for all PADF observation cells (Protocol #19);

    g. Video retention for minimum 30 days, or 90 days in event of death (Protocol #21)

    h. Supervisors must take reasonable steps to resolve medical conflicts, including direct calls to on-call physicians or utilizing 911 services (Protocols #12, #16);

    i. Annual discussion of Emily Rice case facts during roll call training (Protocol #14)

204.     Despite the implementation of Emily's Protocols, Denver has continued to demonstrate deliberate indifference to detainee medical needs, as evidenced by

a. The 2008 case of Timothy Thomason, who was denied his terminal cancer medications while in pre-arraignment detention despite informing officers of his Stage IV non-Hodgkin lymphoma diagnosis, resulting in his death, for which Denver paid $150,000. *See Thomason v. City and County of Denver,* 1:07-cv-01715 (Dist. Colo.).

b. The 2010 death of Marvin Booker in Denver jail custody, resulting in a $6 million settlement in 2014, after deputies used excessive force including tasers and restraints that lead to his death. *See Estate of Marvin Booker v. City and County of Denver,* 1:11-cv-00645 (Dist. Colo.)

c. The 2011 case of Jamal Hunter, tortured by fellow inmates while the on-deputy ignored his screams and allegedly turned off lights to obstruct video surveillance, resulting in a $3.25 million settlement. *See Estate of Jamal Hunter v. City and County of Denver,* 1:12-cv-02682 (Dist. Colo.)

d. The 2015 death of Michael Marshall in Denver jail custody after being forcibly restrained and denied proper medical care, resulting in a $4.6 million settlement.

e. The 2022 death of 79-year-old Leroy "Nicky" Taylor in Denver jail custody, where staff were deliberately indifferent to his medical needs despite his insistence that he was dying. *See Estate of Leroy Taylor v. City and County of Denver*, 1:23-cv-02355 (Dist. Colo.)

205.    On November 24, 2023, just two weeks after Decedent Waylon John's death, the Denver Citizen Oversight Board sent a letter to the Denver Mayor and City Attorney highlighting the troubling lack of transparency concerning deaths in custody and the resulting cost to Denver

taxpayers from settlements for law enforcement misconduct including deliberate medical indifference.

*Failure to Train, Supervise, and Discipline*

206.    The City and County of Denver has failed to adequately train its law enforcement officers and jail staff regarding

      a.    Constitutional limits on the use of force

      b.    Recognition of serious medical needs

      c.    Proper activation and use of body-worn cameras;

      d.    Required cell checks and monitoring procedures;

      e.    Documentation requirements for medical encounters

207.    This failure to train amounts to deliberate indifference because the need for proper training is obvious given the frequency of in-custody deaths and injuries.

208.    Denver has actual knowledge of deficiencies through prior lawsuits, settlements, and investigations; the inadequacy of training is so likely to result in constitutional violations that policymakers can reasonably be said to be deliberately indifferent.

209.    Denver has failed to adequately supervise its officers and jail staff, as evidenced by

      a.    The October 2024 disciplinary findings against Deputies Andujar and Gutierrez for violations of body-worn camera policies and cell check requirements in connection with Decedent Waylon John's death

      b.    Repeated instances of officers failing to conduct required cell checks;

      c.    Systematic failures to document medical encounters and use of force

210.    Denver has maintained a policy and practice of failing to meaningfully discipline officers who violate constitutional rights, thereby ratifying unconstitutional conduct and encouraging future violations

*Specific Knowledge and Deliberate Indifference*

211.    Prior to Decedent Waylon John's death, Denver had specific knowledge of the unconstitutional conditions and practices described herein through:

      a.  Multiple prior wrongful death lawsuits and settlements;

      b.  Internal investigations revealing systemic deficiencies;

      c.  Reports from the Office of the Independent Monitor;

      d.  Complaints from the Citizen Oversight Board;

      e.  Federal investigations and consent decrees.

212.    Despite the knowledge, Denver failed to implement meaningful reforms or ensure compliance with existing protocols, demonstrating deliberate indifference to the constitutional rights of detainees.

213.    The constitutional violations suffered by Decedent Waylon John were the direct and foreseeable result of these longstanding policies, customs, and practices

*Conspiracy to Violate Rights and Conceal Misconduct*

214.    The City and County of Denver maintains policies and practices that facilitate and encourage conspiracies among employees to violate constitutional rights and conceal misconduct.

215.    These policies include

      a.  Inadequate oversight of body-worn camera activation and footage preservation;

    b.  Coordinated responses to in-custody medical emergencies designed to minimize liability;

    c.  Systematic obstruction of transparency and accountability measures;

    d.  Retaliation against those who report misconduct

216.    The City and County of Denver have been credibly accused of concealing misconduct and falsifying records in several cases, including:

    a.  Two deputies were suspended for falsifying records in the case of Emily Rice's 2006 in-custody death; *See* https://www.denverpost.com/2014/08/24/emily-rices-parents-outraged-by-denver-sheriff-training-video-whitewash/

    b.  A 2009 case involving Alex Landau where multiple Denver police officers assaulted four women and covered-up the brutality by prosecuting the victims, resulting in a $360,000 settlement. *See* https://www.westword.com/news/denver-diner-cases-360k-settlement-exposes-culture-of-police-brutality-attorney-says-5827306/

    c.  A 2009 lawsuit brought by Michael DeHerrera, settled for $17,500, where officers were found to falsify official reports to conceal their use of excessive force. *See* https://www.westword.com/news/michael-deherrera-talks-about-reinstatement-of-cops-who-beat-him-video-5863725/

    d.  Deputy Gaynel Rumer, who received only a 40-day suspension, turned off lights to obstruct video footage during the 2011 assault against Jamal Hunter by fellow inmates— Denver police officers were later accused of intimidating witnesses in this case. *See* https://www.denverpost.com/2014/07/26/jamal-hunters-jail-abuse-case-shakes-denver-law-enforcement-offices/

e. The 2011 case of Alex Landau, settled for $795,000, where bystanders were pressured to sign false statements about a police brutality incident after a traffic stop. *See* https://www.denverpost.com/2011/05/02/man-beaten-by-denver-officers-awarded-795000-by-city-council/

f. The 2016 case of Gregory Heard, where responding officers and their supervisor prepared false police reports to cover up the use of excessive force by Officer Greg Dulayev. *See* https://www.denverpost.com/2017/08/10/denver-police-department-sued-homeless-man-taser/

g. A 2023 SWAT raid into the wrong apartment unit, where Denver police officers terrorized young children and are alleged to cover up the raid by filing inaccurate reports downplaying their use of force; *See* https://www.denverpost.com/2025/02/25/denver-police-swat-wrong-house-girls-shelton-lawsuit/

217. The investigation into Decedent Waylon John's death resulted in findings of violations by multiple officers, yet these findings were concealed from Plaintiff and her counsel, demonstrating the ongoing nature of the conspiratorial conduct.

218. Defendants' refusal to provide records concerning Decedent's arrest, detention, and death, despite multiple requests under CCJRA, CORA, and the Integrity Act, is part of this pattern of concealment and obstruction.

## VII.    CLAIMS FOR RELIEF

*Federal Causes of Action*

### FIRST CLAIM FOR RELIEF
**Arrest Without Probable Cause**
**U.S. Const. Amend. IV**
**42 U.S.C. §1983**

**(November 3, 2023 Denver Police Officer Defendants Eduardo Medero and Corey Hagan)**

219.     Plaintiff incorporates by reference all allegations set forth above as though fully set forth herein

220.     The Fourth Amendment of the United States Constitution protects individuals against unreasonable seizures, including the prohibition on arrest without probable cause

221.     This constitutional provision is enforceable against state and local officials through 42 U.S.C. § 1983.

222.     At all times relevant hereto, DPD Officer Defendant Medero and DPD Officer Defendant Hagan were acting under color of state law within the meaning of 42 U.S.C. § 1983.

223.     On November 3, 2023, Individual Denver Officer Defendant Medero and Defendant Hagan used force to detain Decedent Waylon John on the street in Lakewood, Colorado by kicking Mr. John, using a "take-down" to slam his face and chest onto the concrete, kneeling on his back and legs, and using pain compliance techniques.

224.     The force used DPD Officer Defendant Medero and DPD Officer Defendant Hagan against Decedent Waylon John on November 3, 2023, effectuated an arrest of Decedent Waylon John in Lakewood, Colorado without probable cause to believe that Mr. John committed a crime or had an open warrant.

225.     As a direct and proximate result of DPD Officer Defendant Medero and DPD Officer Defendant Hagan's unlawful arrest of Mr. John, Mr. John suffered serious physical injuries to his head, face, chest, and body, and emotional trauma.

226.     The actions of DPD Officer Defendant Medero and DPD Officer Defendant Hagan violated Decedent's rights to be free from arrest without probable cause as guaranteed by the Fourth Amendment to the United States Constitution.

227.     As a direct and proximate result of DPD Officer Defendant Medero and DPD Officer Defendant Hagan violations of Mr. John's constitutional rights, the Estate of Waylon John has suffered damages including pain and suffering, loss of life, loss of companionship, and other damages to be proven at trial

**SECOND CLAIM FOR RELIEF**
**Excessive Force**
**U.S. Const. Amend. IV**
**42 U.S.C. §1983**
**(November 3, 2023 Denver Police Officer Defendants Eduardo Medero and Corey Hagan)**

228.     Plaintiff incorporates by reference all allegations set forth above as though fully set forth herein

229.     The Fourth Amendment of the United States Constitution protects individuals against unreasonable seizures, including the use of excessive force during arrests and investigatory stops.

230.     The Fourteenth Amendment to the United States Constitution guarantees due process and equal protection, and prohibits the use of excessive force against pretrial detainees.

231.     Both constitutional provisions are enforceable against state and local officials through 42 U.S.C. § 1983.

232.     At all times relevant hereto, DPD Officer Defendant Medero and DPD Officer Defendant Hagan were acting under color of state law within the meaning of 42 U.S.C. § 1983.

233.     On November 3, 2023, DPD Officer Defendant Medero and DPD Officer Defendant Hagan used excessive force against Decedent Waylon John to apprehend and arrest him, including kicks, a "take-down" onto his face and chest, kneeling on his body, and pain compliance techniques. This excessive physical force caused wounds and injury to Mr. John's head, face, chest, and body as evidenced by his booking photograph.

234.    The force used DPD Officer Defendant Medero and DPD Officer Defendant Hagan was unreasonable in light of the facts and circumstances confronting them at the time, as Mr. John posed no immediate threat to the safety of the officers or others.

235.    As a direct and proximate result of the use of excessive force DPD Officer Defendant Medero and DPD Officer Defendant Hagan, Decedent Waylon John suffered serious physical injuries and emotional trauma.

236.    The actions of DPD Officer Defendant Medero and DPD Officer Defendant Hagan violated Waylon John's rights to be free from unreasonable seizures guaranteed by the Fourth Amendment to the United States Constitution.

237.    The actions of DPD Officer Defendant Medero and DPD Officer Defendant Hagan violated Mr. John's rights to substantive due process guaranteed by the Fourteenth Amendment to the United States Constitution.

238.    As a direct and proximate result of DPD Officer Defendant Medero and DPD Officer Defendant Hagan violations of Waylon John's constitutional rights, the Estate of Waylon John and his family have suffered damages including pain and suffering, loss of life, loss of companionship, and other damages to be proven at trial.

### THIRD CLAIM FOR RELIEF
**Failure to Intervene in Excessive Force**
**U.S. Const. Amend. XIV**
**42 U.S.C. §1983**
**(November 3, 2023 DPD Defendant Officers Kennedy, Hagan, Schaal, Bartz, Jackson, Kramer, Holm, Husum, Eberharter, Moen, Giannotti, Vose)**

239.    Plaintiff incorporates by reference all allegations set forth above as though fully set forth herein

240.    At all times relevant hereto, Defendants Hagan, Kennedy, Schaal, Bartz, Jackson, Kramer, Holm, Husum, Eberharter, Moen, Giannotti, and Vose were acting under color of state law within the meaning of 42 U.S.C. § 1983.

241.    An officer who fails to intervene to prevent a fellow officer's excessive use of force may be liable under § 1983

242.    Defendants Hagan, Kennedy, Schaal, and Bartz knew that Mr. John was not the person identified in the wanted bulletin on November 3, 2023.

243.    Even though Defendants Hagan, Kennedy, Schaal, and Bartz knew that Mr. John was not the person in the bulletin, they did not alert other officers to this fact and thereby set in motion a series of acts by Defendants Medero, Kennedy, Jackson, Kramer, Holm, Husum, Eberharter, Moen, Giannotti, and Vose and Hagan which they knew or reasonably should have known would cause others to inflict constitutional injury upon Mr. John.

244.    Defendant Hagan had an opportunity to prevent or intervene in Defendant Medero's unlawful and excessive use of force.

245.    Instead, Defendant Hagan participated by jumping on to Mr. John, slamming his face and chest into the ground, and using force to restrain Mr. John and apply plain compliance techniques even though Defendant Hagan knew that Mr. John was not the person who was identified in the bulletin.

246.    Defendant Kennedy knew and had been advised by Defendant Hagan that Mr. John was not the person who was identified in the bulletin. Defendant Kennedy had an opportunity to prevent or intervene in Defendant Medero's and Defendant Hagan's unlawful and excessive use of force.

247.    Defendants Kennedy, Hagan, Jackson, Kramer, Holm, Husum, Eberharter, Moen, Giannotti, and Vose had an opportunity to prevent or intervene in Defendant Medero's and Defendant Hagan's unlawful and excessive use of force against Mr. John.

248.    Defendants Hagan, Kennedy, Jackson, Kramer, Holm, Husum, Eberharter, Moen, Giannotti, and Vose should have but did not intervene in the unlawful and excessive use of force by Defendants Medero and Hagan against Waylon John.

249.    As a direct and proximate result of DPD Officer Defendant Hagan, Kennedy, Jackson, Kramer, Holm, Husum, Eberharter, Moen, Giannotti, and Vose failure to intervene in violations of Waylon John's constitutional rights, the Estate of Waylon John and his family have suffered damages including pain and suffering, loss of life, loss of companionship, and other damages to be proven at trial.

**FOURTH CLAIM FOR RELIEF**
**Patient Dumping to Jail**
**42 U.S.C. §1395dd "EMTALA"**
**(Defendant Denver Health)**

250.    Plaintiff incorporates by reference all allegations set forth above as though fully set forth herein.

251.    At all times relevant hereto, the Defendant Denver Health & Hospital Agency was a participating hospital in that Denver Health accepted Medicare and Medicaid monies

252.    At all times relevant to this complaint, Defendant Denver Health & Hospital Authority had policies and procedures in effect for the screening of patients in the emergency department to determine whether or not an emergency medical condition exist, and for stabilizing such any such conditions

253.    The Defendant Hospital EMTALA policies designate doctors, physicians assistants, and nurse practitioners as the "qualified medical personnel" responsible for conducting the medical screening examinations required under the EMTALA statute

254.    The purpose of the medical screening examination required by EMTALA and Defendant's EMTALA policy is to determine whether a patient is suffering from an emergency medical condition. If the screening shows that an emergency medical condition exists, the hospital must stabilize the patient before transfer or release.

255.    Law Enforcement brought Mr. John to Defendant Denver Health emergency department on November 3, 2025. Upon arrival Mr. John indicated that he ingested four fentanyl pills. Denver Health Providers observed him to be having an "accidental overdose," as well as suffering from chest pain and difficulty breathing.

256.    At all times relevant hereto, Defendant Denver Health had policies and standing orders concerning the assessment and stabilizing treatment of difficulty breathing, including shortness of breath

257.    At all times relevant hereto, Defendant  Denver Health had policies and standing orders concerning the assessment and stabilizing treatment of cardiovascular conditions, including abnormal ECG/EKG exams

258.    Mr. John presented in the emergency department of Defendant  Denver Health for a suspected "drug overdose." A drug overdose is an emergency medical condition of sufficient severity that the absence of immediate medical treatment could reasonably be expected to result in placing Mr. John's health in serious jeopardy including serious impairment of his body functions or serious dysfunction of his bodily organs including his heart and lungs

259.    Even though Defendant Denver Health providers knew Mr. John may be suffering from a drug overdose and marked in Mr. John's medical record that Mr. John was "Positive SBIRT" (Screening Brief Intervention Referral Treatment), Defendant healthcare practitioners did not do an appropriate medical screening examination within the capability of Defendant Denver Health's emergency department (or ancillary services routinely available to the emergency department) by failing to test Mr. John's blood or urine to determine the levels of any drugs in his system, which was reasonably necessary to determine whether an emergency medical condition existed.

260.    Denver Health providers did not order Mr. John admitted for stabilizing treatment or monitoring for a drug overdose.

261.    Mr. John arrived to Defendant Denver Health Emergency Department complaining of pain in his chest.

262.    Mr. John arrived to Defendant Denver Health Emergency Department complaining of difficulty breathing. He was wheezing, coughing, and displayed falling blood oxygen levels.

263.    Chest pain is an emergency medical conditions of sufficient severity that the absence of immediate medical treatment could reasonably be expected to result in placing Mr. John's health in serious jeopardy including serious impairment of his body functions or serious dysfunction of his bodily organs including his brain, heart and lungs.

264.    Difficulty breathing is an emergency medical conditions of sufficient severity that the absence of immediate medical treatment could reasonably be expected to result in placing Mr. John's health in serious jeopardy including serious impairment of his body functions or serious dysfunction of his bodily organs including his brain, heart and lungs.

265.    In response to Mr. John's complaints of chest pain Defendant Denver Health providers administered an electrocardiogram (ECG) and chest x-ray on Mr. John. After learning that Mr. John's ECG results were abnormal, Defendant Denver Health providers did not order any additional medical examination of Mr. John's cardiac condition, nor did they admit him for treatment required to stabilize his medical condition prior to transfer.

266.    In response to Mr. John's complaints of difficulty breathing Defendant Denver Health Healthcare providers placed him on supplemental oxygen. Defendant Denver Health providers did not order any additional medical examination of Mr. John's respiratory condition, nor did they admit him for treatment required to stabilize his medical condition prior to transfer.

267.    Even though Mr. John was suffering in an unstable medical condition including overdose, chest pain and difficulty breathing, Defendant healthcare practitioners transferred Mr. John to the Denver jail healthcare partners without any stabilization or instructions for follow up care other than "please dont (sic) use drugs."

268.    In spite of the known and obvious risk that an untreated overdose, heart condition, and difficulty breathing might become life-threatening, Defendant Denver Health practitioners did not order necessary medical examinations of Mr. John's conditions or admit him for treatment required to stabilize his emergency medical conditions prior to transfer to Denver jail healthcare partners.

269.    The Denver jail is not a medical facility for evaluation and stabilization within the meaning of EMTALA.

270.    Even if the Denver jail is considered a "medical facility," transferring Mr. John to the Denver jail healthcare partners was not an appropriate transfer.

271.    The transfer to the Denver jail was not requested in writing by Mr. John or certified in writing by a physician that the medical benefits reasonably expected from the transfer outweighed the increased risks to Mr. John.

272.    The lack of medical assessment or stabilizing treatment was not reasonable under the circumstances

273.    The decision to transfer Mr. John was not an appropriate transfer

274.    Because Mr. John did not receive necessary assessments or stabilizing care for his emergency medical conditions (overdose, heart problems, difficulty breathing), his conditions deteriorated, directly and proximately leading to his death on November 7, 2023.

### FIFTH CLAIM FOR RELIEF
**Deliberate Indifference to Medical Needs of Pretrial Detainee**
**U.S. Const. Amend. XIV**
**42 U.S.C. §1983**
**(Defendant Denver Health Jail Healthcare Partner Nurse Lauren Haley-Legel, and Denver Health Jail Healthcare Partner John Doe Defendants #1-10)**

275.    Plaintiff incorporates by reference all allegations set forth above as though fully set forth herein.

276.    Decedent Waylon John as a pretrial detainee had the right to be free from deliberate indifference to his known serious medical needs

277.    Defendant Jail Healthcare Partner Nurse Lauren Haley-Legel, and Denver Health Jail Healthcare Partner John Doe Defendants were at all times employees of the state of Colorado acting under color of law within the meaning of 42 U.S.C. § 1983.

278.    Defendant Jail Healthcare Partner Nurse Lauren Haley-Legel, and Denver Health Jail Healthcare Partner John Doe Defendants knew Mr. John's history of substance abuse issues

because of Mr. John's prior participation in the MAT program and his assessment of "accidental overdose" in the Emergency Department.

279.    Defendant Jail Healthcare Partner Nurse Lauren Haley-Legel, and Denver Health Jail Healthcare Partner John Doe Defendants received Mr. John's medical records from Denver Health Emergency Department and therefore knew that Mr. John was overdosing and experiencing chest pain while having cardiac and respiratory problems.

280.    Defendants knew of obvious injuries visible in Mr. John's November 7, 2023 booking photograph

281.    Defendants knew Mr. John was housed in the medical unit on the second floor of the Denver Downtown Detention Center.

282.    Even though DSD Defendants and Denver Health Jail Healthcare Partner Defendants knew of Mr. John's conditions and knew of his housing placement in the second floor medical unit, Defendant Jail Healthcare Partner Nurse Lauren Haley-Legel and Denver Health Jail Healthcare Partner John Doe Defendants failed to provide Mr. John with the proper medications and monitoring for a person with chest pain, cardiac and respiratory conditions who is overdosing.

283.    Instead, Mr. John was allowed to vomit and bleed in his cell for four days without treatment. Defendant Jail Healthcare Partner Nurse Lauren Haley-Legel, and Denver Health Jail Healthcare Partner John Doe Defendants did not monitor Mr. John sufficiently on November 3, 4, 5, 6, or 7 to take note of the increasing pile of vomit next to his door, or the blood collecting under his head in his cell, or to treat the conditions causing Mr. John to continuously vomit and bleed.

284.    During the four days in custody of the Denver Downtown Detention Center, Mr. John did not have access to the phone, family visits, or counsel. Denver Health Jail Healthcare John Doe Defendants did not allow Mr. John to contact his mother or family members.

285.    Defendant Jail Healthcare Partner Nurse Lauren Haley-Legel, and Denver Health Jail Healthcare Partner John Doe Defendants knowingly ignored the substantial risk of serious harm to Mr. John by failing to monitor or treat Mr. John's overdose, cardiac, or respiratory conditions, including by failing engage in cell checks or activate body worn cameras.

286.    Defendant Jail Healthcare Partner Nurse Lauren Haley-Legel, and Denver Health Jail Healthcare Partner John Doe Defendants failed to take reasonable measures to abate the substantial risk of serious harm to Mr. John by leaving Mr. John in a cell filled with vomit and blood, suffering from an untreated head wound, and refusing to appropriately escalate his level of care when his condition deteriorated.

287.    Waylon John suffered a sufficiently serious harm in that he was in severe pain and fear of death for four days before he died of cardiac arrest, during which he was not provided with either the medical treatment that could have reduced his pain nor the medical diagnosis that could have removed his fear of death

**SIXTH CLAIM FOR RELIEF**
**Deliberate Indifference to Medical Needs of Pretrial Detainee**
**U.S. Const. Amend. XIV**
**42 U.S.C. §1983**
**(All named DSD Defendants, DSD John Does #1-10, DSD Command Staff John Does #11-15, DSD Medical Staff John Does #16-25)**

288.    Plaintiff incorporates by reference all allegations set forth above as though fully set forth herein.

289.     Pretrial detainees have a Fourteenth Amendment substantive due process right to adequate medical care while in custody.

290.     At all times relevant herein, Individual Defendants were acting under color of state law within the meaning of 42 U.S.C. § 1983.

291.     From November 3-7, 2023, Individual Defendants were deliberately indifferent to Decedent Waylon John's serious medical needs while he was detained in the custody of the Denver Sheriff Department.

292.     Despite obvious injuries visible in Mr. John's booking photograph and his serious medical conditions, Individual Defendants failed to provide constitutionally adequate medical care.

293.     Following previous arrests Mr. John participated in the MAT program and required Medically Assisted Therapy (MAT) for the substance abuse issues noted at Denver Health ED

294.     Individual Defendants knew of and disregarded an excessive risk to Decedent's health and safety by failing to provide necessary medical treatment for his head injuries, breathing difficulties, and substance use issues.

295.     The Individual Defendants' deliberate indifference to Decedent's serious medical needs was objectively unreasonable and violated clearly established law.

296.     As a direct and proximate result of Individual Defendants' deliberate indifference, Decedent Waylon John endured unnecessary pain and suffering, and ultimately died on November 7, 2023

**EIGHTH CLAIM FOR RELIEF**
***Monell* Failure to Train, Policy, Practice, Custom Excessive Force**
**42 U.S.C. §1983**
**(Defendant City & County of Denver)**

297.    Plaintiff incorporates by reference all allegations set forth above as though fully set forth herein.

298.    At all times relevant herein, Defendant City and County of Denver, through its Denver Police Department, maintained official policies, widespread customs, and persistent practices that violated the constitutional rights of individuals subjected to police encounters, including but not limited to:

    a.    An official or unofficial policy of using excessive force during arrests and detentions without regard to the actual threat posed by the subject;

    b.    A widespread practice of failing to properly train officers in de-escalation techniques and appropriate use of force;

    c.    A persistent custom of inadequate supervision and oversight of officers during arrests and detentions;

    d.    A pattern of failing to discipline officers who use excessive force, thereby encouraging such conduct.

299.    The constitutional violations described herein were committed pursuant to the official policies, widespread customs, and persistent practices of Defendant City and County of Denver.

300.    Defendant City and County of Denver's policies, customs, and practices were the moving force behind the constitutional violations suffered by Decedent Waylon John.

301.    As a direct and proximate result of these policies, customs, and practices, Decedent Waylon John's constitutional rights were violated, resulting in his injuries and ultimate death

## NINTH CLAIM FOR RELIEF
***Monell* Failure to Train, Unconstitutional Policy and Practice to Violate Civil Rights/EMTALA**
**42 U.S.C. §1983**
**(Defendants City & County of Denver, Denver Health)**

302.    Plaintiff incorporates by reference all allegations set forth above as though fully set forth herein.

303.    The Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd, requires hospitals to provide appropriate medical screening examinations and stabilizing treatments to individuals presenting with emergency medical conditions.

304.    Pretrial detainees have a clearly established Fourteenth Amendment right to receive adequate medical screening and treatment, which includes the protections afforded by EMTALA when brought to medical facilities.

305.    At all times relevant herein, Defendants City and County of Denver and Denver Health and Hospital Authority maintained official policies, widespread customs, and persistent practices that fostered and facilitated conspiracies among their employees to violate the constitutional and statutory rights of detainees, including but not limited to:

a.    An official or unofficial policy or custom of conducting perfunctory medical clearances at Denver Health that deliberately understated or concealed injuries and medical conditions to prioritize continued detention despite serious medical needs;

b.    An official or unofficial policy or custom of coordination and communication between Denver Sheriff Department officials and Denver Health medical personnel to minimize documentation of force-related injuries and to clear detainees for jail custody despite contraindications;

c.    An official or unofficial policy or custom of mutual concealment whereby law enforcement and medical personnel failed to adequately document, report, or investigate obvious signs of excessive force and serious medical conditions;

    d.   An official or unofficial policy or custom of inadequate medical screening that violates EMTALA standards and constitutional requirements, conducted pursuant to an implicit understanding between Defendants to prioritize keeping detainees in custody over medical necessity;

    e.   An official or unofficial policy or custom of failing to activate, maintain, or preserve body-worn camera footage and medical records when such documentation would reveal coordination between law enforcement and medical staff to violate detainee rights;

    f.   An official or unofficial policy or custom of inadequate training, supervision, and discipline regarding the coordination between law enforcement and medical personnel, despite knowledge that such coordination frequently resulted in constitutional violations;

    g.   An official or unofficial policy or custom of retaliatory concealment and obstruction when families or advocates sought records regarding in-custody injuries, medical neglect, and deaths, demonstrating a continuing conspiracy to avoid public accountability.

306.   The policies, customs, and practices described above were deliberately structured to facilitate coordination between law enforcement and medical personnel in ways that predictable resulted in constitutional violations.

307.   Defendants' deliberate structuring of the relationship between DSD and Denver Health created an environment in which individual officers and medical personnel understood they were expected to coordinate their conduct in ways that prioritized custody over constitutional rights and medical necessity.

308.    Defendants' policies and practices amount to deliberate indifference to the constitutional rights of pretrial detainees because the ended for proper medical screening, adequate documentation, and independent medical decision-making was obvious, and the inadequacy of Defendants' procedures was so likely to result in violations of constitutional rights that the policymakers can reasonably be said to have been deliberately indifferent.

309.    Despite the establishment of "Emily's Protocols" in 2008 following the wrongful death of Emily Rice due to medical neglect in Denver custody, Defendants maintained the unconstitutional policies, customs, and practices described herein, demonstrating actual knowledge that their coordinated conduct would result in constitutional violations.

310.    Defendants had actual and constructive notice through prior incidents, complaints, settlements and investigations that their coordinated policies and practices between law enforcement and medical personnel were resulting in serious injuries and deaths of detainees.

311.    Defendants' failure to discipline, retrain, or alter procedures despite repeated similar incidents demonstrates an overt act of conspiratorial conduct by final policymakers

312.    The policies, customs, and practices maintained by Defendants were the moving force behind the conspiracy that deprived Decedent Waylon John of his constitutional rights.

313.    The coordinated conduct between DSD and Denver Health officials with respect to Decedent Waylon John was not an isolated incident, but rather the predictable result of longstanding policies, customs, and practices that incentivized and facilitated such conspiracies.

314.    The constitutional violations suffered by Decedent Waylon John would not have occurred but for Defendants' policies, customs, and practices that facilitated and encouraged coordination between law enforcement and medical personnel to the detriment of detainee rights to appropriate medical care for serious medical needs while in custody

**TENTH CLAIM FOR RELIEF**
**Unconstitutional Policy, Pattern and Practice of Deliberate Indifference to Serious Medical Needs of Medically Emergent Pretrial Detainees**
**42 U.S.C. §1983**
**(Defendants City and County of Denver, Denver Health)**

315. Plaintiff incorporates by reference all allegations set forth above as though fully set forth herein.

316. At times relevant herein, Defendants maintained official policies, widespread customs, and persistent practices that violated the constitutional rights of pretrial detainees, including but not limited to:

> a. An official or unofficial policy requiring jail medical staff to minimize medical treatment and defer to security concerns over medical necessity;
>
> b. A persistent custom of failing to provide constitutionally adequate medical screening examinations as required by EMTALA and the Fourteenth Amendment;
>
> c. A widespread practice of under-reporting and misclassifying in-custody medical emergencies and deaths to avoid liability and scrutiny.

317. Despite knowledge of prior similar incidents and the establishment of Emily's Protocols specifically designed to prevent medical neglect of vulnerable persons in custody, Defendants failed to adequately train, supervise, and discipline staff responsible for medical care of detainees.

318. Defendants' policies, customs, and practices were the moving force behind the constitutional violations suffered by Decedent Waylon John.

319.    Defendants acted with deliberate indifference to the constitutional rights of pretrial detainees by maintaining these policies, customs, and practices despite knowledge that they would likely result in constitutional violations.

320.    As a direct and proximate result of these policies, customs, and practices, Decedent Waylon John's constitutional rights were violated, resulting in his unnecessary suffering and wrongful death on November 7, 2023.

## ELEVENTH CLAIM FOR RELIEF
**Deprivation of Right to Indian Family Association
U.S. Const. Amend. XIV
42 U.S.C. §1983
(DSD John Does #1-10, DSD Command Staff John Does #11-15, and DSD Medical Staff John Does #16-25, Denver Health Jail Healthcare Partner John Doe Defendants #1-15, Denver Health John Doe Defendants #1-5)**

321.    Plaintiff incorporates by reference all allegations set forth above as though fully set forth herein

322.    At all times relevant to this Complaint, Plaintiff Johanna Holy Elk Face was the Dakota (Standing Rock Sioux Tribal Nation) mother of Decedent Waylon John, also a citizen of the Standing Rock Sioux Tribal Nation

323.    The United States Congress and Colorado legislature have found and declared that that nothing is more vital to the continued existence and integrity of Indian Tribes than their children. 25 U.S.C. §1901(3) and C.R.S. §19-1.2-102(1)(k)(1)

324.    As the Dakota mother of Decedent Waylon John, Plaintiff Johanna Holy Elk Face had a right to freedom of intimate association with her son protected by the Fourteenth Amendment.

325.    This constitutional protection is enforceable against state and local officials pursuant to 42 U.S.C. § 1983.

326.    At all times relevant hereto, Individual DSD John Does #1-10, DSD Command Staff John Does #11-15, and DSD Medical Staff John Does #16-25, Denver Health Jail Healthcare Partner John Doe Defendants #1-15, Denver Health John Doe Defendants #1-5 were acting under color of state law within the meaning of 42 U.S.C. § 1983.

327.    DSD John Does #1-10, DSD Command Staff John Does #11-15, and DSD Medical Staff John Does #16-25, Denver Health Jail Healthcare Partner John Doe Defendants #1-15 acted under color of law when Defendants interfered with Plaintiff's ability to associate with her son Waylon John, and with Mr. John's ability to communicate with his mother November 3-7, 2023;

328.    Individual DSD John Does #1-10, DSD Command Staff John Does #11-15, and DSD Medical Staff John Does #16-25, Denver Health Jail Healthcare Partner John Doe Defendants #1-15 acted under color of law with the intention to interfere with and deprive Plaintiff of her familial relationship with her son while he was in custody at the Denver Downtown Detention Center;

329.    Denver Health John Doe Defendants #1-5 acted under color of law when Defendants interfered with and deprived Plaintiff of the ability to associate with her son by removing her number from Decedent's emergency contact file, delaying calling Plaintiff to the hospital on November 7, 2023, and authorized cessation of Decedent's life support in the Plaintiff's absence on November 7, 2023

330.    Denver Health John Doe Defendants #1-5 acted under color of law with the intention to interfere with and deprive Plaintiff of her familial relationship with her son in the final hours of his life

331.    The Defendants' intentional conduct under color of law November 3-7, 2023 did in fact interfere with and deprive Plaintiff of her right to family association with her son, Decedent Waylon John.

*Colorado Causes of Action*

### TWELVTH CLAIM FOR RELIEF
**Excessive Force**
**Colo. Const. Art. II, Section 7**
**C.R.S. §13-21-131**
**(DPD Defendants Eduardo Medero and Corey Hagan)**

332.    Plaintiff incorporates by reference all allegations set forth above as though fully set forth herein

333.    Section 7 of Article II of the Colorado Constitution protects individuals against unreasonable searches and seizures, including excessive force.

334.    This constitutional provision is enforceable against state and local officials through C.R.S. §13-21-131.

335.    At all times relevant hereto, DPD Officer Defendant Medero and DPD Officer Defendant Hagan were "peace officers" within the meaning of C.R.S. §13-21-131.

336.    On November 3, 2023, DPD Officer Defendant Medero and DPD Officer Defendant Hagan used excessive force against Decedent Waylon John to apprehend and arrest him, including kicks, a "take-down" onto his face and chest, kneeling on his body, and pain compliance techniques. This excessive physical force caused wounds and injury to Mr. John's head, face, chest, and body as evidenced by his booking photograph.

337.    The force used DPD Officer Defendant Medero and DPD Officer Defendant Hagan was unreasonable in light of the facts and circumstances confronting them at the time, as Mr. John posed no immediate threat to the safety of the officers or others.

338.    As a direct and proximate result of the use of excessive force DPD Officer Defendant Medero and DPD Officer Defendant Hagan, Decedent Waylon John suffered serious physical injuries and emotional trauma.

339.    The actions of DPD Officer Defendant Medero and DPD Officer Defendant Hagan violated Waylon John's rights to be free from unreasonable seizures guaranteed by Article II Section 7 of the Colorado Constitution.

340.    As a direct and proximate result of DPD Officer Defendant Medero and DPD Officer Defendant Hagan violations of Waylon John's constitutional rights, the Estate of Waylon John and his family have suffered damages including pain and suffering, loss of life, loss of companionship, and other damages to be proven at trial

## THIRTEENTH CLAIM FOR RELIEF
### Deliberate Indifference to Medical Needs
### Colo. Const. Art. II, Section 25
### C.R.S. §13-21-131
### (All named DSD Defendants, DSD John Does #1-10, DSD Command Staff John Does #11-15, and DSD Medical Staff John Does #16-25)

341.    Plaintiff incorporates by reference all allegations set forth above as though fully set forth herein.

342.    Per the Colorado Constitution, pretrial detainees have a substantive due process right to adequate medical care while in custody.

343.    At all times relevant herein, Defendants were "peace officers" as defined by C.R.S. § 24-31-901 (3), acting under color of law, and are liable per C.R.S. § 13-21-131.

344.    From November 3-7, 2023, Individual Defendants were deliberately indifferent to Mr. John's serious medical needs while he was detained in the custody of the Denver Sheriff Department.

345.    Despite obvious injuries visible in Mr. John's booking photograph and his serious medical conditions, Individual Defendants failed to provide constitutionally adequate medical care.

346.    Following previous arrests Mr. John participated in the MAT program and required Medically Assisted Therapy (MAT) for the substance abuse issues noted at Denver Health.

347.    Despite this previous knowledge and his obviously serious conditions, Defendants disregarded an excessive risk to Mr. John's health and safety by failing to provide necessary medical treatment for his head injuries, breathing difficulties, and substance use issues.

348.    Defendants' deliberate indifference to Mr. John's serious medical needs was objectively unreasonable and violated clearly established law.

349.    As a direct and proximate result of Defendants' deliberate indifference, Mr. John endured unnecessary pain and suffering, and ultimately died on November 7, 2023

### FOURTEENTH CLAIM FOR RELIEF
**Declaratory Judgement**
**The Colorado Criminal Justice Records Act ("CCJRA")**
**C.R.S. 13-51-105 and 106, C.R.C.P. 57, C.R.S. 24-72-301 et seq.**
**(Defendants City & County of Denver, DPD, DSD, Webber)**

350.    Plaintiff incorporates by reference all allegations set forth above as though fully set forth herein.

351.    A genuine controversy exists between Plaintiff and Defendants concerning the respective rights and responsibilities of the parties under the Colorado Criminal Justice Records Act ("CCJRA") C.R.S. 24-72-301 et seq. to provide the records sought by the Plaintiff concerning the arrest, detention, and death of her son Waylon John.

352.    Plaintiff is entitled to an Order declaring her rights to receive the records concerning the arrest, detention, and death of her son

**FIFTEENTH CLAIM FOR RELIEF**
**Order to Show Cause and Award Penalty for Denial of Inspection of Records**
**C.R.S. 24-72-305(7)**
**(Defendant Andrea Webber)**

353.        Plaintiff incorporates by reference all allegations set forth above as though fully set forth herein.

354.        Plaintiff has been and continues to be entitled to receive the records sought concerning Waylon John's arrest, detention, treatment, and death in the custody of Denver law enforcement agencies on November 3, 4, 5, 6, and 7.

355.        All internal investigations concerning the arrest, detention, and death of Waylon John were completed and closed by November 1, 2024 at the very latest.

356.        Defendant Andrea Webber's denial of access to the records sought, specifically the refusal to acknowledge request for and complete denial of access to any records concerning Mr. John's time detained in the Denver Downtown Jail November 3-7, 2023 for which at least two officers have been found to be in violation of rules concerning treatment of inmates, has been arbitrary and capricious.

357.        Because Defendant has denied Plaintiff's valid request Plaintiff is entitled to an Order directing Defendant to show cause "at the earliest practical time" why the criminal justice records at issue should not be made available to the Plaintiff. C.R.S. § 24-72-305(7).

358.        As the result of Defendant's arbitrary and capricious denial of access to records concerning the arrest, detention, and death of her son, Plaintiff is entitled to and hereby requests that the Court award her a monetary penalty of $25/day for each day that access to the records has been improperly denied

**SIXTEENTH CLAIM FOR RELIEF**

**Declaratory Judgement**
**The Colorado Enhance Law Enforcement Integrity Act ("The Integrity Act")**
**C.R.S. 13-51-105 and 106, C.R.C.P. 57, C.R.S. 24-72-301 et seq.**
**(Defendants City & County of Denver, DPD, DSD, Webber)**

359.          Plaintiff incorporates by reference all allegations set forth above as though fully set forth herein.

360.          The Colorado Enhance Law Enforcement Integrity Act expressly and plainly requires the Defendant to disclose the records sought following a complaint of peace officer misconduct. C.R.S. 24-31-902(2)(a).

361.          The Integrity Act further requires disclosure of the records sought to the parent of a victim who died in custody. C.R.S. 24-31-902(2)(b).

362.          Plaintiff submitted a complaint of law enforcement misconduct with respect to her son on October 3, 2024 and twenty-one days thereafter re-requested records. For nearly one year Plaintiff has suffered, is currently suffering, and will continue to suffer irreparable harm that cannot be compensated through money damages, as the direct and proximate result of Defendants' denial of Plaintiff's statutory right pursuant to the Integrity Act to access the records sought.

363.          As a complainant of law enforcement misconduct and mother of a man who died in custody, Plaintiff meets all of the statutory requirements of the Integrity Act and is entitled to the records concerning Waylon John which she seeks. C.R.S. 24-31-902(2)(a), (b).

364.          Plaintiff is entitled to and hereby requests an injunction commanding the Defendants to release forthwith all records at issue

**VIII.          PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Johanna Holy Elk Face respectfully requests the Court enter judgment in her favor against each of the Defendants, and award Plaintiff all relief allowed by law including but not limited to the following:

a) All appropriate relief at law and equity;

b) Economic damages on all claims as allowed by law;

c) Declaratory and injunctive relief as allowed by the CCJRA and the Integrity Act;

d) Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of life, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

e) Punitive damages on all claims allowed by law and in an amount to be determined at trial;

f) Attorneys' fees and the costs associated with this action, including expert witness fees, on all claims allowed by law;

g) Pre- and post-judgment interest at the appropriate lawful rate; and

h) Any further relief this court deems just and proper, and any other relief as allowed by law.


**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**


Respectfully submitted November 3, 2025.


LAW OFFICE OF SANDRA C. FREEMAN LLC

*s/ Sandra C. Freeman*
Sandra C. Freeman
1500 N. Grant Street #8070
Denver, Colorado 80203

(720)593-9004
sandra@sandrafreemanlaw.com

*s/ Joseph Chase*
Joseph Chase
Shulman Chase LLC
PO Box 9164
Denver, CO 80209
(720) 288-0850
joey@shulmanchase.com


*s/ Dan C. Korff-Korn*
Dan C. Korff-Korn** *Pending Admission to District of Colorado*
Sacred Defense Fund
PO Box 27
Santa Fe, NM 87504
(505) 699-1180
dov@sacreddefense.org